UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

      MID-STATE RACEWAY, INC.               CASE NO.  04-65746
                                                                  Chapter 11
                        Debtor                    Jointly Administered
--------------------------------------------------------
IN RE:
      MID-STATE DEVELOPMENT
      CORPORATION                          CASE NO.  04-65745

                        Debtor
--------------------------------------------------------
APPEARANCES:

| | |
|---|---|
| STROOCK & STROOCK & LAVAN LLP | CHRISTOPHER DONOHO, ESQ. |
| Attorneys for Oneida Entertainment, LLC | Of Counsel |
| 180 Maiden Lane | KENNETH PASQUALE, ESQ. |
| New York, New York 10038-4982 | Of Counsel |
| | |
| HISCOCK & BARCLAY, LLP | J.  ERIC CHARLTON, ESQ. |
| Attorneys for Oneida Entertainment, LLC | Of Counsel |
| One Park Place | |
| 300 South State Street | |
| P.O. Box 4878 | |
| Syracuse, New York 13221-4878 | |
| | |
| HARRIS BEACH, LLP | LEE E. WOODARD, ESQ. |
| Attorneys for Debtors | Of Counsel |
| One Park Place | |
| 300 S.  State Street | |
| Syracuse, New York 13202 | |
| | |
| MCGUIREWOODS LLP | JAMES P. RICCIARDI, ESQ. |
| Attorneys for Vernon Downs Acquisition, LLC | Of Counsel |
| 1345 Avenue of the America, 7th Floor | SHAWN R. FOX, ESQ. |
| New York, NY 10105 | Of Counsel |
|       and | |
| 625 Liberty Avenue | MARK E. FREEDLANDER, ESQ. |
| 23rd Floor, Dominion Tower | Of Counsel |
| Pittsburgh, PA 15222 | |
| | |
| BOND, SCHOENECK & KING, LLP | STEPHEN A. DONATO, ESQ. |

| | |
|---|---|
| Attorneys for Official Committee of Unsecured Creditors<br>One Lincoln Center<br>Syracuse, New York 13202-1355 | Of Counsel |
| MENTER, RUDIN & TRIVELPIECE, P.C.<br>Attorneys for Vestin Mortgage, Inc.<br>500 S. Salina Street, Suite 500<br>Syracuse, New York 13202-3300 | JEFFREY A. DOVE, ESQ.<br>Of Counsel |
| E. LISA TANG, ESQ.<br>Attorney for Dominick A. Giambona<br>118 Huntersfield Rd.<br>Delmar, NY 12054 | |
| COSTELLO, COONEY & FEARON, PLLC<br>Attorneys for County of Oneida<br>205 South Salina St.<br>Syracuse, NY 13202-1327 | ANTHONY R. HANLEY, ESQ.<br>Of Counsel |
| GUY A. VAN BAALEN, ESQ.<br>Assistant U.S. Trustee<br>10 Broad Street<br>Utica, New York 13501 | |

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

Under consideration by the Court is a motion, filed on November 23, 2005, pursuant to 11 U.S.C. § 1126(e) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code") ("§ 1126(e) Motion") by Oneida Entertainment, LLC ("Oneida"). In its § 1126(e) Motion, Oneida initially asserted that discovery has revealed improper dealings, misleading contact with creditors and material failures of disclosure by the Gural Plan Proponents[1] - all grounds, it contends, for

---

[1] The "Gural Proponents" are comprised of Mid-State Raceway, Inc. and Mid-State Development Corporation (the "Debtors"), as well as Vernon Downs Acquisition, LLC ("VDA").

3

determining that certain votes cast in favor of the Gural Plan and against the Oneida Plan[2] were voted in bad faith and should be designated or disqualified pursuant to Code § 1126(e). The main focus of Oneida, as argued by counsel at a hearing held on December 13, 2005, is on an agreement entered into between VDA and VIP Structures, Inc. ("VIP"), one of four claimants identified in Class 3 of both plans.[3] Opposition to the § 1126(e) Motion was filed on behalf of the Debtors on December 8, 2005. Opposition was also filed on behalf of VDA, the Official Committee of Unsecured Creditors (the "Committee") and Dominic Giambona that same date.

At the hearing on December 13, 2005, Oneida contended that although apparently in the final stages of negotiations on September 13, 2005, the transfer of the VIP claim was undisclosed when the Gural Disclosure Statement, dated September 13, 2005, was presented to the Court at a hearing on September 16, 2005, and that the solicitation of VIP's vote was not procured in good faith.[4]

## JURISDICTIONAL STATEMENT

---

Jeffrey Gural is the managing member of VDA, which was organized by Gural and TrackPower, Inc. to facilitate the acquisition of the Debtors through the Gural Plan. The Court has under consideration the Third Modified Amended Joint Plan of Reorganization Proposed, dated September 13, 2005, filed by the Gural Proponents and otherwise referred to as the "Gural Plan."

[2] Oneida submitted its First Amended Plan of Reorganization, also dated September 13, 2005, and referred to herein as the "Oneida Plan." On December 12, 2005, Oneida filed its Modified First Amended Plan of Reorganization.

[3] Only three of the four claimants filed ballots by the deadline set by the Court of October 31, 2005. VIP was one of those three, holding a claim representing approximately 96% of the total claim amount in the class.

[4] At the hearing held on December 13, 2005, Oneida's counsel indicated that it would not be necessary for the Court to conduct an evidentiary hearing and that it could simply rely on the papers submitted in connection with the motion by the parties.

4

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A), (L) and (O).

## **FACTS**

According to the affidavit of David Nutting ("Nutting"), VIP's chief operating officer, VIP first entered into an agreement with Mid-State Raceway prepetition on August 6, 2003, under a contract valued at $3,507,544 for design and construction work on a video lottery terminal facility ("VLT Facility") to be located at the racetrack operated by the Debtors. *See* Nutting Affidavit, sworn to December 8, 2005, at ¶ 2. According to Nutting, on October 22, 2003, VIP agreed to defer payment of up to $800,000 due until no later than November 4, 2004. *Id.* at ¶ 4. On January 7, 2004, VIP filed a Notice of Mechanic's Lien in the Oneida County Clerk's Office against the Debtors' real property located in Oneida County. *Id.* at ¶ 5. The Debtors filed their petitions on August 11, 2004.

At the request of VDA, VIP continued its design work on the VLT Facility postpetition, receiving payment from Gural and/or VDA. *Id.* at ¶ 8. The initial plan of the Gural Proponents was dated August 16, 2005. Upon receipt of that plan, VIP allegedly contacted VDA asserting that it was entitled to the payment of interest on its claim as a secured creditor with a mechanics lien filed against the Debtors' real property.[5] According to Nutting, in September 2005, Eric Spector, a proponent of the Oneida Plan, also contacted VIP asking to purchase its claim for $807,998.93. *Id.* at 10. Nutting declined the offer, finding it unacceptable because of the

---

[5] On December 29, 2004, VIP filed a proof of claim in the amount of $807,998.93.

5

substantial interest that had accrued on its claim postpetition. *Id.* Nutting acknowledges having conversations with Gural concerning VDA's purchase of the VIP claim during the week of September 6, 2005, which culminated in the agreement on September 14, 2005 ("VIP Agreement"), for payment of $850,000.[6] *Id.* at ¶¶ 11 and 13.

Under the terms of the VIP Agreement, VIP agreed to forgo interest of approximately $70,000 and to accept payment of $850,000 in full satisfaction of its claim. There is also a provision under which the "Reorganized Debtors" would execute construction management agreement(s) with VIP, giving VIP the right of first refusal on all construction projects undertaken at the Vernon Downs racetrack and/or Hotel having an aggregate cost of $100,000 or more, for which VIP would receive a five percent management fee.[7]

Nutting indicates that the decision to transfer VIP's claim to VDA was based on several factors, including the fact that VDA was a client of VIP; the view that the VDA plan was likely to be approved given Gural's status in the horse racing industry; the fact that the $850,000 would provide VIP with a portion of the interest owed to it; and VIP was to be given the opportunity to perform subsequent work for the Reorganized Debtors. *Id.* at ¶ 15-17.

The VIP Agreement provides for assignment of the VIP claim either the earlier of 60 days after its execution or the effective date of the Gural Plan. The Notice of Transfer of the VIP

---

[6] Nutting notes that on September 13, 2005, VIP received an offer from Oneida of $860,000, payable as soon as the assignment was executed. *Id.* at ¶ 14. According to Nutting, he never responded to the offer. *Id.* The VIP Agreement, although dated September 13, 2005, and signed by Gural that date, allegedly was not signed by Nutting until the evening of September 14, 2005.

[7] On November 23, 2005, the Gural Plan Proponents filed a "Plan Addendum" setting forth the terms of the construction management agreement with VIP.

6

claim was filed on November 15, 2005 (Docket No. 770). Thus, VIP was still the owner of the claim when it cast its ballot accepting the Gural Plan and rejecting the Oneida Plan. The Debtors point out that while VIP was required, under the terms of the VIP Agreement to vote to accept the Gural Plan, there is no provision requiring that it vote to reject the Oneida Plan.[8]

**DISCUSSION**

Code § 1126(e) provides:

On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

11 U.S.C. § 1126(e). The section allows the Court to disallow the vote of an entity that fails to act in good faith in either voting or soliciting votes for or against a plan. *See In re Park Plaza Associates Ltd. Partnership*, 100 F.3d 1214, 1219 (6th Cir. 1996).

Although not defined in the Code,

the concept of good faith is a fluid one, and no single factor can be said to inexorably demand an ultimate result, nor must a single set of factors be considered. It is always necessary to keep in mind the difference between a creditor's self interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest. Prior cases can offer guidance, but, when all is said and done, the bankruptcy court must simply approach each good faith determination with a perspicacity derived from the data of its informed practical experience in dealing with bankrupts and their creditors.

---

[8] Under the terms of the VIP Agreement, VIP agreed to support and not object to the VDA Plan of Reorganization. It also required that VIP not file or vote in favor of or support any or all competing plans in the Debtors' bankruptcy case. *See* ¶ 3 of the VIP Agreement, attached to Oneida's § 1126(e) Motion. There is also a provision whereby VIP "agrees to take reasonable action to assist VDA to have the VDA Plan of Reorganization confirmed and become effective." *Id.* at ¶ 4.

7

*In re Figter, Ltd.*, 118 F.3d 635, 639 (9th Cir. 1997); *see also 255 Park Plaza Associates*, 100 F.3d at 1219 (noting that "whether bad faith exists can only be decided after an analysis of the facts of each case").

It is obvious that the Court has a great deal of discretion in determining whether to designate, i.e. disqualify, the vote of a creditor. "Designation is the exception, rather than the rule, and a creditor is free to vote its self-interest with respect to its claim." *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995). In making the determination, the courts have identified several badges of fraud which may warrant disqualification of a creditor's vote. These include creditor votes designed to

> (1) assume control of the debtor, *In re Landing Associates Ltd.*, 157 B.R. 791, 807-08 (Bankr. W.D. Tex. 1993); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 290 (Bankr. W.D.Pa. 1990), (2) put the debtor out of business or otherwise gain a competitive advantage, *Landing Associates, Ltd.*, 157 B.R. at 808; *In re MacLeod Co.*, 63 B.R. 654, 655-56 (Bankr. S.D. Ohio 1986); *see In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 672 (E.D.Pa. 1942) (dictum) . . . (3) destroy the debtor out of pure malice. *In re Landing Associates Ltd.*, 157 B.R. at 808; *cf. In re Marin Town Center*, 142 B.R. 374, 379 (N.D. Cal. 1992) ("Section 1126(e) does not require a creditor to have an interest in seeing the debtor reorganize") . . . or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize. *See Landing Associates*, 157 B.R. at 809.

*Dune Deck Owners*, 175 B.R. 844-45.

In this case, the Gural Plan Proponents did not vote the VIP shares; rather, VIP cast its own vote in Class 3. VIP clearly does not wish to assume control of the Debtors. Nor does it wish to put the Debtors out of business or to destroy them out of malice. The agreement VIP has with VDA in exchange for the transfer of its claim does not depend on the Debtors' failure to reorganize. In fact, it is in VIP's own self-interest that the Debtors reorganize. It is actually not the "self-interest" of VIP that Oneida is focusing on in seeking relief pursuant to Code § 1126(e).

8

Rather, it is the "self-interest" of the Gural Plan Proponents, particularly VDA, that Oneida is asking that the Court scrutinize in connection with the solicitation of VIP's vote.

As the cases have indicated, self-interest, without more, is not a sufficient basis for disqualification of the votes of a creditor. As noted by the court in *Pine Hill Collieries*,

> [i]f a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. On the other hand, pure malice, 'strikes' and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.

*Pine Hill Collieries*, 46 F.Supp. at 671; *see also 255 Park Plaza Associates*, 100 F.3d at 1219 (stating that "the Bankruptcy Code does not require 'selfless disinterest'"); *Marin Town Center*, 142 B.R. at 379 (commenting that "[w]ere this court to adopt Debtor's position [that bad faith exists whenever claims are purchased to block approval of a plan], investors would have little incentive to purchase claims from any creditor in bankruptcy").

The issue now confronting this Court must be addressed in the context of there being two competing plans, as was the case in *Allegheny Int'l, Inc.* and *In re Applegate Property, Ltd.*, 133 B.R. 827 (Bankr. W.D. Tex. 1991), both cited by Oneida in support of its position. In *Allegheny International*, Japonica Partners purchased claims in two classes after approval of the debtor's disclosure statement. The two classes were diametrically opposed in litigation filed by the creditor's committee in that case against various secured bank lenders. Nevertheless, its purchase qualified Japonica, an investment firm, to file a competing plan. The court expressed concerns that Japonica was not a prepetition creditor. The court determined that Japonica, "who chose to become a creditor, should not have veto control over the reorganization process." *Allegheny Int'l*, 118 B.R. at 290. The court found favor with the analysis in *255 Park Plaza* and its finding

9

that there is no per se rule that a plan proponent may not purchase the claims of creditors.  In addition, the court in *Allegheny International* acknowledged that "the purchase of claims for the purpose of securing approval or rejection of a plan of reorganization is not per se bad faith," relying on a decision of the Second Circuit Court of Appeals, *In re P-R Holding Corp.*, 147 F.2d 895 (2d Cir. 1945). *Allegheny Int'l*, 118 B.R. at 289.  The court in *P-R Holding* had noted that "[w]hen that purchase is in aid of an interest other than an interest as a creditor, such purchases may amount to 'bad faith' . . . ." *P-R Holding*, 147 F.2d at 897.  Not only was the court in *Allegheny International* concerned about the timing of the purchase of the claims by Japonica prior to the voting period on the debtor's plan, the court took note of the amounts paid for the claims by Japonica.  *See Allegheny Int'l*, 118 B.R. at 289.  The court found that once a sufficient percentage had been attained to allow Japonica to block the plan, the amount it paid for the claims decreased.  *Id.* at 289-90.  The court also pointed out that  "Japonica, who chose to become a creditor, should not have veto control over the reorganization process."  *Id.* at 290.  Based on those concerns, the court disqualified the votes of Japonica held in two classes pursuant to Code § 1126(e).  *Id.*

In *Applegate* competing plans had been proposed by the debtor and a creditor.  Daseke Consulting, Inc. ("Daseke"), an affiliate of the debtor, purchased a majority of the unsecured claims, seeking to vote them in favor of the debtor's plan and against that of the creditor.  The debtor took the position that the claims had been purchased in order to prevent the creditor from purchasing them.  *Applegate*, 133 B.R. at 828.  Of concern to the court was the fact that the debtor in its disclosure statement had not revealed that its affiliate had purchased 57.82% of the claims of unsecured trade claimants for face value prior to balloting.  The court went on to

explain that the debtor could not "legitimately argue that a reasonable investor could be expected to make an informed decision without information about Daseke's claims acquisition." *Id.* at 831. It was the position of the court that holders of claims or interests "would want to know that a related entity of the Debtor was acquiring claims in a potentially controlling class in order to dominate such class for voting purposes." *Id.* at 830. The court concluded that it was a material fact relevant to the voting process that should have been disclosed. *Id.* The court then examined whether the ballots cast by the affiliate in favor of the debtor's plan should be struck. The court indicated that it would disregard the acceptances filed by Daseke pursuant to Code § 1129(a)(10) because they had been filed by an insider of the debtor. *Id.* at 833. The court found it unnecessary to reach the issue of whether to disqualify the votes pursuant to Code § 1126(e). *Id.*

However, Code §1126(e) was considered by the court in the context of Daseke's vote <u>rejecting</u> the plan of the creditor. In this regard, the court found that "[t]he purchasing of claims by an affiliate or insider of the Debtor for the sole or principal purpose of blocking a competitor from purchasing such claims is an obstructionist tactic done in contemplation of gaining an unfair advantage over other creditors. Such conduct cannot, as a matter of law, be in good faith." *Id.* at 835. The court noted that it was "unable to ascertain any independent, legitimate interest which would justify the purchase of these claims by Daseke than to obstruct the competing plan proponent [and] ensure the confirmability of their own plan . . . . That purpose will not withstand the 'good faith' hurdle imposed by Section 1126(e)." *Id.* The court took exception to "[t]he evil of an insider's acquiring a blocking position," finding it "especially insidious in the context of competing plans . . . ." Id.

In *In re CrossCreek Apartments, Ltd.*, 211 B.R. 641 (Bankr. E.D. Tenn. 1997), the court

was confronted with the issue of whether Condor One, Inc. ("Condor"), a creditor of the debtor with a claim of $10.2 million, had acted "in less than good faith in purchasing and voting [] four unsecured trade claims." Condor had purchased the claims in their full amount in July and August 1996, prior to the filing of any plan of reorganization. Three of the four transfers were identified in Condor's disclosure statement, filed on February 25, 1997. *Id.* at 643. Condor did not file a notice of transfer of the claims until May 1, 1997, the day after it voted the four claims against the competing plan filed by the "Partners."[9] *Id.* Condor took the position that it was entitled to "pursue such purchases to protect its interests and that the law is clear that purchases such as these do not constitute a basis for disqualifying the ballots cast by it against the Partners' third amended plan." *Id.*

The court in *CrossCreek* found that the Partners had actual knowledge of the transfers, given that three of the four had been disclosed in Condor's disclosure statement.[10] The court found it persuasive that at the time of the purchase of the claims it was uncertain what would transpire in the case and that Condor had purchased the claims merely to protect itself and its claim. *Id.* at 648. The court concluded that "[b]ecause the Partners have failed to come forward with any proof that Condor was not simply protecting its claim by purchasing the unsecured trade claims, [it could not] conclude that the claims purchased by Condor and voted against the Partners' plan was done in bad faith." *Id.*

After having considered the analysis in *Allegheny International, Applegate* and

---

[9] The "Partners" are simply identified as two individuals, Walter F. Trent and Lynwood G. Willis. There is no indication in the decision concerning their relationship, if any, to the debtor.

[10] Due to inadvertence, the $260 claim of Pestco U.S.A., Inc. had not been listed in Condor's disclosure statement.

*CrossCreek*, the Court finds that they are distinguishable from the matter presently before this Court.  With respect to the claim of VIP, the Court is persuaded that VDA's sole purpose for purchasing the VIP claim was not to block the Oneida constituency from confirmation of its plan. There is no doubt that when VIP voted against the Oneida Plan it had that effect as it clearly prevented Oneida from obtaining the vote of an impaired class.  However, it also had the effect of settling the claim in furtherance of the plan being proposed by both the Debtors and Gural/VDA.  It did not provide creditor status to Gural/VDA that was lacking.  Indeed, as noted previously, Gural has a substantial postpetition claim in this case, having contributed approximately $3 million in financing to allow the Debtors to continue limited operations pending confirmation.  The purchase of the VIP claim afforded protection to VDA as both creditor and plan proponent.  It is difficult to attribute an ulterior motive to VDA's actions, particularly when one considers that the same efforts towards settlement of the claim arguably would have occurred even in the absence of a competing plan.  There is no evidence to support the position that the transfer of the VIP claim to VDA was an obstructionist tactic intended to have as its primary purpose the gaining of an unfair advantage over the Oneida Plan Proponents. As pointed out by VDA and the Debtors, VIP provided consideration for the treatment it is to receive if the Gural Plan is confirmed.  The Court acknowledges that the transfer of the claims did provide an advantage to the Gural Plan Proponents that was denied the Oneida Plan Proponents.  However, there has been no proof that Oneida's unsuccessful efforts to purchase the VIP claim were the result of fraud or untoward behavior by the Gural Plan Proponents.  Rather, it appears that the transfers occurred in the context of arms-length negotiations between sophisticated parties which benefitted both VDA and VIP and contributed to a consensual

13

confirmation process as far as VIP's claim was concerned.

There is the issue of disclosure to be addressed, however. Oneida asserts that the Gural Plan Proponents should have disclosed the fact that VDA was in the final stages of negotiations with VIP when they presented their Third Modified Amended Disclosure Statement, dated September 13, 2005, to the Court at a hearing on September 16, 2005. Citing to *Applegate*, Oneida takes the position that the ballot cast by VIP rejecting its plan should be disqualified pursuant to Code § 1126(e). In response the Debtors point out that Court deadline for submission of any amendments to their disclosure statement was set as September 13, 2005 at 1:00 p.m.[11] In addition, VDA points out that the VIP Agreement was not finalized until the evening of September 14, 2005, when Nutting, on behalf of VIP, signed it. VDA emphasizes the fact that it was VIP that owned the claim at the time it cast its ballot, and that the VIP Agreement did not require that VIP reject the Oneida Plan. It was not an insider or affiliate of the Debtor that cast the ballot, as was the case in *Applegate*. The Court is at a loss to find any prejudice to those voting in Class 3 due to the lack of disclosure of the claim transfer until after the balloting had been completed. Both of the other claimants in Class 3 voted to accept both plans and also expressed a preference for the Gural Plan. The only rejection in the class was that filed by VIP against the Oneida Plan. That rejection, admittedly, prevents the Oneida Plan from complying with Code § 1129 (a)(10).[12] However, it is the opinion of the Court that the disclosure of the

---

[11] By Letter Decision and Order, dated August 22, 2005, the Court mandated "that any filing of further amendments to either Disclosure Statement by the Plan Proponents . . . is prohibited absent further Order of this Court. On September 13, 2005, the Court signed an Order amending the August 2005 Order "to allow the Gural Co-Proponents to file their amended Disclosure Statement and Plan on or about 1:00 p.m. Eastern Time on September 13, 2005."

[12] At the hearing on December 13, 2005, there was some suggestion by Oneida that if it had known of the transfer of the VIP claim, it would have structured its plan differently to

14

transfer prior to October 31, 2005, would not have changed the outcome of the balloting.  The efforts by Gural and the Debtors in negotiating settlements appears to have been solely directed at reaching resolutions of matters that might interfere with the ultimate confirmation process.  The Court does not believe that VDA's conduct rises to the level of a finding of an ulterior motive in connection with its solicitation of votes.

Based on the foregoing, it is hereby

ORDERED that Oneida's motion pursuant to Code § 1126(e) seeking to designate and disqualify the vote of VIP is denied.

Dated at Utica, New York

this 22nd day of December 2005

/s/ Stephen D.  Gerling
STEPHEN D.  GERLING
Chief U. S. Bankruptcy Judge

---

separately classify each of the holders of mechanic's liens.  Arguably, such a strategy may still be available to Oneida although the Court takes no position on the appropriateness of such a strategy at this time.