UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

      MID-STATE RACEWAY, INC.           CASE NO. 04-65746
                                                                     Chapter 11
                          Debtor             Jointly Administered
--------------------------------------------------------
IN RE:
      MID-STATE DEVELOPMENT
      CORPORATION                            CASE NO.  04-65745

                          Debtor
--------------------------------------------------------
APPEARANCES:

STROOCK & STROOCK & LAVAN LLP      CHRISTOPHER DONOHO, ESQ.
Attorneys for Oneida Entertainment, LLC      Of Counsel
180 Maiden Lane
New York, New York 10038-4982

HISCOCK & BARCLAY, LLP      J. ERIC CHARLTON, ESQ.
Attorneys for Oneida Entertainment, LLC      Of Counsel
One Park Place
300 South State Street
P.O. Box 4878
Syracuse, New York 13221-4878

HARRIS BEACH, LLP      LEE E. WOODARD, ESQ.
Attorneys for Debtors                      Of Counsel
One Park Place
300 S. State Street
Syracuse, New York 13202

MCGUIREWOODS LLP      JAMES P. RICCIARDI, ESQ.
Attorneys for Vernon Downs Acquisition, LLC      Of Counsel
1345 Avenue of the America, 7th Floor
New York, NY 10105
        and
625 Liberty Avenue      MARK E. FREEDLANDER, ESQ.
23rd Floor, Dominion Tower      Of Counsel
Pittsburgh, PA 15222


BOND, SCHOENECK & KING, LLP      STEPHEN A. DONATO, ESQ.

| | |
|---|---|
| Attorneys for Official Committee of Unsecured Creditors<br>One Lincoln Center<br>Syracuse, New York 13202-1355 | Of Counsel |
| MENTER, RUDIN & TRIVELPIECE, P.C.<br>Attorneys for Vestin Mortgage, Inc.<br>500 S. Salina Street, Suite 500<br>Syracuse, New York 13202-3300 | JEFFREY A. DOVE, ESQ.<br>Of Counsel |
| E. LISA TANG, ESQ.<br>Attorney for Dominick A. Giambona<br>118 Huntersfield Rd.<br>Delmar, NY 12054 | |
| COSTELLO, COONEY & FEARON, PLLC<br>Attorneys for County of Oneida<br>205 South Salina St.<br>Syracuse, NY 13202-1327 | ANTHONY R. HANLEY, ESQ.<br>Of Counsel |
| GREEN & SEIFTER, PLLC<br>Attorneys Harness Horse Association of<br>Central New York, Inc.<br>One Lincoln Center, Suite 900<br>110 West Fayette Street<br>Syracuse, NY 13202 | STEVEN A. PAQUETTE, ESQ.<br>Of Counsel |

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

The Court considers the motion filed on December 28, 2005, by Oneida Entertainment, LLC ("Oneida"), on shortened notice, seeking a determination pursuant to Rule 3019 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") that further disclosure and resolicitation of votes are not required with respect to its Modified First Amended Plan of Reorganization, filed by it on December 12, 2005, as well as its Second Modified First Amended Plan of Reorganization, filed on December 23, 2005, (hereinafter referred to jointly as the

"Modified Oneida Plan"). Opposition to Oneida's motion was filed on behalf of Dominick A. Giambona ("Giambona") and John J. Signorelli ("Signorelli") on January 4, 2006. On January 5, 2006, opposition was also filed on behalf of Mid-State Raceway, Inc. ("Debtor" or "Raceway") and Mid-State Development Corporation (hereinafter jointly referred to as the "Debtors") and Vernon Downs Acquisition, LLC ("VDA"). Opposition was also filed on behalf of Vestin Mortgage, Inc. ("Vestin"), All Vernon Acquisition, LLC ("AVA") and All Capital, LLC ("AC") (hereinafter referred to jointly as "Vestin/AVA/AC") on January 5, 2006. In addition, the Official Committee of Unsecured Creditors (the "Committee") filed opposition on January 5, 2006.

The motion was heard on January 6, 2006, at a special term of the Court at Utica, New York. After hearing oral argument on the motion, the Court afforded the parties an opportunity to file memoranda of law. The matter was submitted for decision on January 13, 2006.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A) and (L)

## FACTS

### Interested Parties

The Debtors filed voluntary petitions pursuant to chapter 11 of the Code on August 11,

4

2004.[1] On August 12, 2004, the Court signed an Order granting joint administration of the two cases. Raceway owns all of the stock of Mid-State Development. Raceway operated the Vernon Downs racetrack in Vernon, New York,[2] and Mid-State Development operates an adjacent hotel, food and proposed video gaming business. Raceway owns the real property on which the hotel is operated.

Jeffrey Gural ("Gural") is the managing member of VDA, which was organized by Gural and TrackPower, Inc. to facilitate the acquisition of the Debtors. On June 14, 2005, the Debtors, along with VDA, as co-proponents, filed their First Joint Plan of Reorganization, along with their disclosure statement.

Oneida is a creditor in the case based on its purchase of certain claims from various creditors of the Debtors. Oneida is a joint venture between an investment fund managed by Plainfield Asset Management LLC and Oneida Capital LLC. According to Oneida's disclosure statement, its partners have expertise in both the gaming and harness racing industries and have been successful in turning around and operating distressed businesses. *See* Oneida's Disclosure Statement, filed September 13, 2005, at 32. Oneida filed its original plan and disclosure statement with the Court on August 17, 2005.

Vestin is the primary secured creditor of both Debtors. Vestin has asserted that it holds

---

[1] An involuntary chapter 11 petition had been filed against Raceway in the U.S. Bankruptcy Court for the District of Nevada on August 9, 2004 (Case No. 04-52382). The filing in the Northern District of New York was in response to the involuntary petition. The involuntary case was dismissed by Order of the Nevada Bankruptcy Court on September 29, 2004, and the case was closed on November 2, 2004.

[2] Allegedly, horseracing and simulcasting operations ceased on July 23, 2004, when Raceway's licenses were suspended.

an allowed claim of over $26 million secured by a first lien on all of the Debtors' real and personal property. Since the filing of the cases, the Debtors and Vestin have entered into a series of stipulations for the use of cash collateral, which have provided for rollover security interests to Vestin. The Vestin loan is guaranteed, at least in part, by Shawn Scott ("Scott").

AVA, an entity owned by Scott, is the alleged owner of 52% of the issued and outstanding shares of Raceway as a result of its purchase of the shares at a foreclosure sale sometime after September 2004 when Raceway Ventures, LLC, which at some point had purchased the shares from various Scott entities, allegedly defaulted on its obligations to those Scott entities. AC is alleged to be a secured creditor, as well as the holder of an unsecured claim in the approximate amount of $550,000. Both AVA and AC are owned by Scott.

Giambona is an unsecured creditor and shareholder of the Debtors. Signorelli also is a shareholder of the Debtors. The Official Committee of Unsecured Creditors ("CC") was appointed in the Debtors' case by the United States Trustee on October 27, 2004.

**Background of the Case**

On March 9, 2005, the Court issued a Memorandum of Law, Findings of Fact, Conclusions of Law and Order in which it denied the Debtors' application for an extension of the exclusivity period to solicit acceptances of their plan beyond April 4, 2005.[3] As noted previously, on June 14, 2005, the Debtors and VDA filed their First Joint Plan of Reorganization, along with their Disclosure Statement. This was amended on August 3, 2005. In the interim, on

---

[3] On February 21, 2005, one day prior to the scheduled hearing on the Debtors' application, the Debtors filed their plan and disclosure statement.

6

July 14, 2005, a chapter 11 plan of reorganization was filed by AC, AVA, Raceway Ventures, LLC and Scott (the "AVA entities"). Their disclosure statement was filed on July 20, 2005. On August 16, 2005, the AVA entities filed their Second Amended Disclosure Statement and Plan. By Letter Decision and Order, dated August 22, 2005, the Court approved the disclosure statements of both the AVA entities and the VDA/Debtor entities.[4] As noted above, Oneida filed its plan of reorganization and disclosure statement on August 17, 2005. On September 13, 2005, Oneida filed its First Amended Chapter 11 Plan, as well as its disclosure statement.[5] On September 21, 2005, the Court signed an Order approving the disclosure statement accompanying the VDA/Debtors' Plan, as well as the disclosure statement accompanying the Oneida Plan. The September 21st Order also set October 31, 2005, as the deadline for the receipt of ballots by the Ballot Agent.

On November 18, 2005, the Executive Director of Financial Balloting Group, LLC, Jane Sullivan ("Sullivan"), filed an affidavit, sworn to November 9, 2005, certifying the tabulation of acceptances, rejections and preferences as to both plans.[6] On December 15, 2005, Sullivan filed an amended affidavit, sworn to on December 14, 2005. According to the latter, Classes 3, 4, 5A and 5B all accepted the VDA/Debtors' Plan. Classes 3, 4, 5A and 5B voted to reject the Oneida

---

[4] On September 13, 2005, VDA/Debtors filed their Third Amended Chapter 11 Plan and Disclosure Statement. Attached to the Disclosure Statement was what was referred to as the "Scott Settlement," which was entered into on September 8, 2005, and which provided for only the plan and disclosure statement filed by the VDA/Debtors to proceed to confirmation ("VDA/Debtors' Plan").

[5] According to the electronic docket, Oneida filed its First Amended Disclosure Statement on September 1, 2005 (Docket No. 683).

[6] Financial Balloting Group was appointed by the September 21st Order of the Court to act as Ballot Agent.

7

Plan. Of relevance to the decision herein is the fact that in Class 3, VIP Structures, Inc.("VIP"),[7] which asserted a claim of $807,998.93 ("VIP Claim") at the time,[8] based on a mechanic's lien, voted to accept the VDA/Debtors' Plan and voted to reject that of Oneida. The other two mechanic's lienors in Class 3, which held claims totaling $30,586.80, submitted ballots accepting both plans.

On November 23, 2005, Oneida filed a motion pursuant to § 1126(e) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code"), to disqualify the votes filed by VIP in favor of the VDA/Debtors' Plan and against the Oneida Plan on the basis of alleged bad faith on the part of VDA/Debtors in connection with the solicitation of VIP's vote. On December 22, 2005, the Court issued its § 1126(e) Decision, denying Oneida's motion. In its § 1126(e) Decision, the Court made reference to the fact that counsel for Oneida had suggested at the hearing on its motion that "if it had known of the transfer of the VIP claim, it would have structured its plan differently to separately classify each of the holders of mechanic's liens [in Class 3]. Arguably, such a strategy may still be available to Oneida although the Court takes no position on the appropriateness of such a strategy at this time." § 1126(e) Decision at 14, n.12.

On December 16, 2005, the Court commenced a confirmation hearing on the VDA/Debtors' Plan. The hearing was continued to December 28, 2005, for further testimony.

---

[7] VIP entered into an agreement with Raceway on or about August 6, 2003, for the design and construction of a video lottery terminal ("VLT") facility to be located at the racetrack operated by the Debtors.

[8] On November 15, 2005, a Notice of Transfer of the VIP Claim was filed, assigning it to VDA. Under the terms of the agreement assigning the claim to VDA, VIP agreed to vote to accept the VDA/Debtors' Plan. *See In re Mid-State Raceway, Inc.*, Case No. 04-65746, slip op. at 6 (Bankr. N.D.N.Y. Dec. 22, 2005) ("§ 1126(e) Decision").

8

The Court allowed the parties an opportunity to file a stipulation of uncontested facts[9] and memoranda of law in support of their respective positions in lieu of closing arguments. The confirmation of VDA/Debtors' Plan was submitted for decision on January 13, 2006.

On December 12, 2005, four days prior to the initial day of testimony on the confirmation of the VDA/Debtors' Plan, Oneida filed its Modified First Amended Plan of Reorganization, in which Oneida proposed, *inter alia*, to pay the unsecured creditors in Class 5A and 5B interest on their claims. On December 23, 2005, the day after the Court issued its § 1126(e) Decision and five days before the adjourned confirmation hearing, Oneida filed its Second Modified First Amended Plan of Reorganization in which it proposed to split Class 3 into three separate classes, Class 3A, consisting of VIP, which previously rejected Oneida's Plan, Class 3B and Class 3C, comprised of creditors that previously accepted both plans but expressed a preference for the VDA/Debtors' Plan. By placing VIP into a separate class, Oneida raises the issue that was not before the Court when it rendered its § 1126(e) Decision.

## ARGUMENTS

In support of its classification of the VIP Claim in a separate class, Oneida asserts that due to VIP's "unique capabilities" it will be offered the opportunity to participate in future construction management projects at the racetrack (an option also offered to VIP by VDA/Debtors' in their plan). Oneida then argues that "VIP's exceptional situation clearly

---

[9] At the hearing held on the within motion on January 6, 2006, the parties advised the Court that they had been unable to reach a stipulation as to uncontested facts and none would be forthcoming.

9

warrants their [sic] different classification from the mechanics' lien claims that compose the remainder of Class 3, citing to *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.,* 149 B.R. 306 (Bankr. E.D.N.Y. 1992) (Holland, B.J.). Oneida goes on to assert that

> VIP has the unparalleled ability to design and oversee the large-scale construction projects that the Reorganized Debtors will have to effect to be a successful harness racing and VLT destination. In addition, due [to] the size and scope of VIP's claim, VIP clearly has different expectations and interest than the other mechanics' lien claimants. These interests are amply demonstrated by the active role VIP has taken in these cases and their [sic] desire to be a [sic] closely tied to the Reorganized Debtors' future construction projects.

Oneida's Motion at 6-7.

There is also an assertion, based on information and belief, that each of the Class 3 claimants is secured by different properties and/or collateral.

VDA/Debtors argue that this Court has basically "bent over backwards" in allowing the Oneida Plan to follow a parallel course with that of VDA/Debtors. They contend that the Court, which has already conducted an evidentiary hearing on VDA/Debtors' Plan that had been accepted and/or preferred by the creditors/equity holders, should proceed with the confirmation of that plan, placing the Oneida Plan on its own path.

VDA/Debtors point out the problems that may arise in the absence of an effective date of the VDA/Debtors' Plan on or before February 28, 2006:

1. Vestin motion for relief from the automatic stay could continue;
2. Vestin's motion to appoint a chapter 11 trustee could continue;
3. Giambona's adversary proceeding involving stock transfers could continue;
4. AVA's appeal of the denial of the motion to remove the directors could continue;
5. AVA's plan of reorganization could be refiled;
6. the continuing "carrying costs" of the dormant Debtor could drive away potential acquirers;
7. unlikely that the 2006 harness racing season will occur what with the licensing issues still unresolved and other tracks are finalizing their schedules;
8. general chaos attendant to the Debtors' cases prior to the filing of the VDA/Debtors' Plan

is likely to occur.

*See* VDA/Debtors' Opposition at 6-7.

VDA/Debtors point out that there is also a significant condition precedent to confirmation of the Oneida Plan, that being resolution of the "Goldfarb/Cherry Claim," which Oneida has requested be estimated.[10] In addition, VDA/Debtors point out that with regard to the treatment of the "VIP Claim," it is no longer VIP's claim as it was assigned to VDA on November 15, 2005. Therefore, the assertion concerning the unique capabilities of VIP have no applicability to the current holder of the VIP Claim, namely VDA. As the VDA/Debtors point out, VDA is not in the business of construction or construction management and is, in fact, a co-proponent of the VDA/Debtors' Plan. Thus, they contend there is no basis for separate classification.

---

[10] Golden Cherry Racing Group et al.("Cherry/Goldfarb Plaintiffs") filed a proof of claim for $30 million based on a breach of contract action in state court seeking to recover compensatory and punitive damages, which was commenced on July 13, 2003, against Raceway and others. The Cherry/Goldfarb Plaintiffs allege fraud and tortious interference by certain of Raceway's directors. Raceway previously objected to the claim, requesting its disallowance or an order limiting the claim to $130,000 on the basis that certain conditions precedent had never been satisfied and no rights had ever vested in the Goldfarb/Cherry plaintiffs.

On or about September 8, 2005, Gural and VDA entered into a settlement with the Cherry/Goldfarb Plaintiffs, which is contingent on confirmation of the VDA/Debtors' Third Amended Plan. In exchange for assigning the claim to VDA, the Cherry/Goldfarb Plaintiffs will receive (i) an amount equal to and paid when the distribution made on a general unsecured claim of $130,000 in the Raceway bankruptcy occurs; and (ii) $170,000 plus an amount equal to the difference between $130,000 and the actual distribution on $130,000 if the Plan becomes effective and VLTs at Vernon Downs race track are licensed, installed, operational and open to the public for 180 days. The Court signed an order on October 21, 2005, granting the Debtors' motion to withdraw their objection to the claim despite opposition by Oneida.

On November 17, 2005, Oneida filed its own objection to the Cherry/Goldfarb claim. In its motion, Oneida made the argument that if the Court were not inclined to disallow the claim, it should reduce it to the amount provided for in the agreement between the Cherry/Goldfarb Plaintiffs and Gural/VDA, namely $130,000. The motion has been carried for control purposes and as of the date of this Decision, is scheduled to be revisited at the motion calendar in Utica, New York on January 24, 2006.

With respect to Code § 1122(a) and the issue of "gerrymandering," the VDA/Debtors cite to the Second Circuit Court of Appeals' decision in *Boston Post Road Ltd. Partnership v. FDIC (In re Boston Post Ltd. Partnership,* 21 F.3d 477 (2d Cir. 1994) and point out that what Oneida is attempting to do is even more egregious than the proposal admonished by the Second Circuit in *Boston Post* because in the case now pending in this Court, voting has already occurred and the classification Oneida is proposing is merely in reaction to the unfavorable vote and rejection of its plan.

VDA/Debtors also make the argument that in the event that the Court were to allow the reclassification, the creditors in Classes 3A, 3B and 3C would need to be resolicited. In addition, VDA/Debtors assert that Class 6 equity interests must also be resolicited because the Modified Oneida Plan includes a term sheet for a "mezzanine facility" providing for warrants "to acquire 5% of the "Borrower," which includes Raceway, on a fully diluted basis" as additional consideration to Oneida for the mezzanine loan. According to VDA/Debtors, the effect of those warrants would be to dilute the 10% equity distribution option offered to Class 6 equity interest holders. It is asserted that the additional $1.6 financing proposed by Oneida would also deplete the value of the 10% equity option provided to equity holders of Raceway.

Oneida responds that in the event that additional capital is needed "to fund the Modified Plan as a result of unimpairing the unsecured creditors, Onedia will make up such contributions through additional equity contributions, which will not impact or dilute the recovery to other shareholders. . . . . Thus, the price that Oneida will 'pay' for 90% of the equity of the Reorganized Debtors will increase, but the value of the shares being distributed to electing eligible shareholders will retain the same value." Oneida Motion at ¶ 5.

Vestin/AVA/AC note that Oneida's original plan, as filed approximately five months ago on August 17, 2005, provided for litigation with Vestin and no guaranteed distribution to unsecured creditors. They contend that since the filing of that plan, Oneida has taken a piecemeal approach in an effort to "remain in the game" by repeatedly amending its plan. It is the position of Vestin/AVA/AC that Oneida could have done something much earlier and now should be compelled to live with the fact that its plan, as previously amended, was not accepted.

Vestin/AVA/AC point out that because Oneida's Plan was not accepted, Fed.R.Bankr.P. 3019, on which Oneida bases its motion, is inapplicable and resolicitation is mandatory. According to Vestin/AVA/AC, Code § 1127(a) requires that there be appropriate solicitation of a modified plan such as Oneida now proposes. In conclusion, Vestin/AVA/AC assert that the time has come to stop Oneida's efforts "to get it right," which have caused great expense and delay to the estate and its creditors.

Giambona and Signorelli assert that "[t]he business reasons stated in Oneida's motions as warranting different classification, particularly since proffered after receiving adverse decisions on disqualifying VIP's votes where nothing else is different and the facts alleged have been known for weeks, if not months, are pure conjecture." Giambona/Signorelli Objection at ¶ 3. The two shareholders also make the argument that

> each day Oneida successfully delays confirmation exponentially jeopardizes the rehabilitation of Vernon Downs. As the Court is well aware, unless finality is achieved sufficient to permit licensing to proceed, meets to be scheduled, construction to begin, and a host of other necessary business considerations to be addressed, the chances for successful reorganization diminish.

*Id.* at ¶ 6.

The Committee makes an argument similar to that of Vestin/AVA/AC that

Fed.R.Bankr.P. 3019 is inapplicable because there has not been previous acceptance of Oneida's Plan. The Committee cites to *In re Dow Corning Corp.*, 227 B.R. 374 (Bankr. E.D. Mich. 1999) (Spector, C.B.J.) for the proposition that, with respect to Fed.R.Bankr.P. 3019, claimants in a class that rejected the original plan "are to be given an opportunity to consider the modification and decide whether they wish to accept it or continue the rejection." *Id.* at 379. The Committee asserts that the claimants/creditors are deemed to vote in the same manner as they voted for the Oneida Plan, unless and until such creditors opt to change their vote upon resolicitation.

In addition, the Committee takes the position that, contrary to Oneida's contention, the unsecured creditors in Class 5A and 5B are still impaired in that there is a provision in the Modified Oneida Plan that qualifies the payment of interest to the unsecured creditors by indicating that it may be paid "unless, . . . the Bankruptcy Court by Final Order requires otherwise or Oneida otherwise agrees." Thus, the Committee argues that the Class 5 creditors' treatment is vague and ambiguous and entitles them to be resolicited as to their votes.

The Committee makes similar arguments to those made by the other parties opposing the motion, namely that Oneida is merely attempting to gerrymand the votes, which is prohibited. The Committee distinguishes the factual situation in *Kliegl* and points out further that Oneida has not demonstrated why the future success of the reorganized Debtors is dependent on the services of VIP. As to the allegations made by Oneida that the claimants in Class 3 may be secured by different properties, the Committee points out that in Oneida's description of Class 3, Oneida states that the liens are secured by "all of the Debtors' real property."[11]

---

[11] At the hearing on January 6, 2006, the Court expressed the view that whether or not the claims in Class 3 were secured by different properties was of only minor relevance to the issue of whether separate classification should be allowed under the circumstances of the case.

14

**DISCUSSION**

While the motion filed by Oneida seeks a determination pursuant to Fed.R.Bankr.P. 3019 that resolicitation of votes is not required with respect to the Modified Oneida Plan, that contention requires the Court to first determine whether the reclassification of the Class 3 creditors into three separate subclasses is even permissible pursuant to Code § 1122(a) because Code § 1127(a) expressly requires compliance with Code § 1122 if a plan proponent seeks to modify its plan prior to confirmation. If such reclassification is not allowed, the Modified Oneida Plan, as now proposed, would not satisfy the requirements of Code § 1129(a)(10) that "at least one class of claims that are impaired under the plan has accepted the plan" and, therefore, could not be confirmed. 11 U.S.C. § 1129(a)(10).

In support of its arguments that VIP is a uniquely situated creditor because of its "unparalleled ability to design and oversee the large-scale construction projects that the Reorganized Debtors will have to effect to be a successful harness racing and VLT destination," VIP relies on the case of *Kliegl Bros.* in which the court noted a split of opinion in the Second Circuit. Specifically, the Hon. Marvin A. Holland, a retired U.S. Bankruptcy Judge, E.D.N.Y., noted that "Judge Prudence Abram made perhaps the strongest and most quoted statement supporting the proposition that all like claims must be classified together when she wrote: 'Although section 1122(a) deals with placing of dissimilar claims in the same class, it by necessary implication deals with the placing of similar claims in different classes. There is no authority for classifying similar claims differently other than section 1122(b) . . . .'" *Kliegl Bros.*, 149 B.R. at 308, quoting *In re Mastercraft Recording Plating, Inc.*, 32 B.R. 106, 108 (Bankr.

S.D.N.Y. 1983).

Judge Holland noted that subsequent cases that followed Judge Abram's reasoning "do so solely in the limited circumstances where: ' . . . it is patently obvious that the *only* reason that the Debtor has separately classified the unsecured claims in . . . [separate classes] is to create a favorable class that will vote to accept the plan to meet the test of section 1129(a)(10).'" *Kliegl Bros.*, 149 B.R. at 308, quoting *In re Waterways Barge Partnership*, 104 B.R. 776, 785 (Bankr. N.D. Miss. 1989) (emphasis supplied).

Judge Holland goes on to note that a contrary position taken by courts is exemplified by a decision of the Hon. Francis G. Conrad, a former U.S. Bankruptcy Judge, S.D.N.Y., sitting by designation, in *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665 (Bankr. N.D. Ind. 1987).  In that case, Judge Conrad applied a more flexible approach to the classification of claims, concluding that it is appropriate to classify unsecured creditors separately if the differences in classification are "in the best interest of the creditors; foster reorganization efforts (ensure success); do not violate the absolute priority rule; and do not needlessly increase the number of classes."  *Id.* at 674.

Judge Holland concluded that "[i]t is well-accepted that: '[a]n alteration which is clearly intended only to create an impaired class to vote in favor of a plan so that a debtor can effectuate a cram-down . . . will not be allowed.' (citation omitted).  However, where sufficient justification exists for separately classifying a creditor, such separate classification will not be nullified merely because such separate class may constitute the only consenting impaired class enabling successful confirmation by 'cram-down.'" *Kliegl Bros.*, 149 B.R. at 309.

The Second Circuit Court of Appeals made it clear in *In re Chateaugay Corp.*, 89 F.3d

16

942 (2d Cir. 1996), that "to warrant separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof." *Id.* at 949, citing *Boston Post,* 21 F.3d at 483. "Thus, classification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *Id.*

The Second Circuit in *Chateaugay*, taking a broader approach to the interpretation of the statute, as both Judge Conrad and Judge Holland had, expressed the view that "Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future economic viability." *Chateaugay,* 89 F.3d at 949-50 (citations omitted). In affirming the decisions of the lower courts, the Second Circuit concurred with the bankruptcy court's finding that the plan proponent had proffered business justification for the classification and had not impermissibly designed the plan solely to engineer an assenting impaired class. *Id.* at 950.

The Second Circuit in arriving at its decision in *Chateaugay* also gave credence to a case cited by many courts, namely, the decision of the Fifth Circuit Court of Appeals in *Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274 (5th Cir. 1992). *See id.* at 950. In *Greystone*, the Fifth Circuit examined the findings of the lower courts that (1) Code § 1122 does not unambiguously prevent classification of like claims in separate classes; (2) the creditor's unsecured deficiency claim was "legally different" from the trade claims because it arose statutorily pursuant to Code § 1111(b); and (3) "good business reasons" justified the separate classification of those unsecured claims. *Greystone*, 995 F.2d at 1278. The court pointed out that the one clear rule to emerge concerning Code § 1122 claims

classification is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1279. The court concluded that "if § 1122(a) permits classification of 'substantially similar' claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Id.*; *see also In re Bernhard Steiner Pianos, USA, Inc.*, 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (indicating that "where a continuing relationship with an unsecured creditor who had a distinct interest in the debtor's business was essential to the continued operations of the debtor, separate classification of that creditor was for a good business reason." (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enterprises, Ltd., II (In re Briscoe Enterprises, Ltd. II)*, 994 F.2d 1160, 1167 (5th Cir. 1993)); *In re New Midland Plaza Associates*, 247 B.R. 877, 893 (Bankr. S.D. Fla. 2000) (stating that "[t]he determination of 'whether there were any good business reasons to support the debtor's separate classification is a question of fact'." (citation omitted)); *but see In re Dow Corning Corp.*, 244 B.R. 634, 644-650 (Bankr. E.D. Mich. 1999), *aff'd,* 255 B.R. (E.D.Mich. 2000), *reconsideration denied,* 2001 WL 278271 (E.D.Mich. 2001), and *aff'd and remanded,* 280 F.3d 648 (6th Cir. 2002) (*dicta*) (analyzing Code § 1122 and concluding that the "legitimate standard" for allowing similar claims to be classified separately is not required by the plain language of the statute but acknowledging that the court was bound to apply it based on binding authority within the Sixth Circuit).

Looking at the facts of this case, Oneida's arguments concerning the uniqueness of VIP and its ability to render construction management services to the Reorganized Debtors are without merit. Admittedly, VIP has a prior relationship with both the Debtors and VDA. However, there is no evidence proffered by Oneida to indicate that VIP is or was the only entity,

within the general Central New York area, with the expertise to carry out construction/construction management at the Debtors' facilities. Indeed, the agreement that VIP entered into with VDA gives it the option, "in its sole discretion," not to act as construction manager for any projects having an aggregate cost of $100,000 or more during the five year period following the effective date of the plan. *See* Addendum to VDA/Debtors' Plan (Docket No. 829, Exhibit 5). It is reasonable to assume that in the event that VIP determined that it did now wish to act as construction manager, the Reorganized Debtors would not be left in a quandary without the ability to hire another entity in a similar capacity and with similar skills and abilities to perform the necessary work at its facilities.

Furthermore, Oneida, in separately classifying the VIP Claim, is not proposing any change in the treatment of the claim. Indeed, the VIP Claim is receiving the same treatment as other creditors in Class 3B and Class 3C, namely payment in full without interest. It is very clear to the Court, despite Oneida's assertions to the contrary, that the separate classification of the VIP Claim is not essential to the Debtor's ultimate reorganization. This would be true even if the claim was still held by VIP, which it is not.

Accordingly, the Court finds that Oneida has not offered any business justification that would warrant separate classification of the VIP Claim. What Oneida is seeking to accomplish is exactly what Code § 1122(a), and the case law addressing that section, prohibits. It is proposing to separately classify the VIP Claim solely for there to be acceptance of the Modified Oneida Plan by the creditors whose impaired claims are classified in Class 3B and Class 3C. Such acceptance would arguably satisfy the requirements of Code § 1129(a)(10) and cure what is currently a plan that has received insufficient acceptances, both in number and amount,

pursuant to Code § 1126.

The Court concludes that Oneida may not separately classify the VIP Claim from the other claims initially assigned to Class 3. Accordingly, the Court need not address whether it would be necessary for Oneida to resolicit the votes of the creditors in Class 3, Class 5A or Class 5B or, as has been suggested by VDA/Debtors, the equity holders in Class 6 pursuant to Fed.R.Bankr.P. 3019. However, the Court does believe it appropriate and necessary to address the arguments made by the various parties concerning the efforts Oneida has made to modify its plan in response to its rejection by the vast majority of creditors. While one might argue that Code § 1127(a) allows a proponent of a plan an unfettered right to modify its plan "at any time before confirmation," it is the view of this Court that the best interest of creditors, as well as the Debtors, must be considered, particularly where there are competing plans to be considered. As Vestin/AVA/AC point out, Oneida's initial plan provided for litigation concerning Vestin's claim. Oneida then determined that it would be more appropriate to pattern its plan after that of the Debtors as part of a parallel confirmation process. The Court begins to wonder why Oneida failed to make an independent determination of what it believed necessary and appropriate to propose as a plan of reorganization prior to the time when its plan was rejected. It was only at that point that it has elected to take a separate path in connection with its treatment of the unsecured creditors, as well as with its treatment of VIP.

Without suggesting that the Court is prohibiting any further resort to Code § 1127(a) by Oneida, the Court intends to make it clear that it cannot and will not condone what appears to be continued "gamesmanship" on the part of Oneida, which arguably could go on indefinitely. Thus, the Court will look very skeptically on any subsequent efforts by Oneida to file another

20

modification of their amended plan in order to gain acceptance pursuant to Code § 1129(a). This conclusion finds support in the decision of the Hon. Sidney M. Aronovitz, Sr., U.S. District Judge, Southern District of Florida, in *In re University Creek Plaza, Ltd.*, 176 B.R. 1011 (S.D. Fla. 1995) in which he concluded that the bankruptcy court had discretion to prohibit the plan proponent from further modifying its plan. *Id.* at 1018. Judge Aronovitz noted that "[t]he record shows that University had already modified and/or amended its Plan four times. In light of these modifications/amendments, and contrary to University's position, this Court does not read 11 U.S.C. § 1127(a) as providing University with the statutory and unlimited right to modify its Plan . . . ." *Id.* Admittedly, the determination of the bankruptcy court was made after it had denied confirmation of University's plan and later dismissed the case. Nevertheless, this Court believes that given the totality of circumstances herein such an approach may be warranted as well.

Based on the foregoing, it is hereby

ORDERED that Oneida's motion seeking a determination pursuant to Fed.R.Bankr.P. 3019 that further disclosure and resolicitation of votes is not required with respect to the Modified Oneida Plan is rendered moot and it is, therefore, denied based on Oneida's failure to comply with the provisions of Code § 1122, as incorporated in Code § 1127(a) and as interpreted by the courts of this Circuit and others.

Dated at Utica, New York

this 19th day of January 2006

/s/   Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge