UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
IN RE:

      MID-STATE RACEWAY, INC.         CASE NO. 04-65746
                                                 Chapter 11
                        Debtor       Jointly Administered
---------------------------------------------------------
IN RE:
      MID-STATE DEVELOPMENT
      CORPORATION               CASE NO. 04-65745

                        Debtor
---------------------------------------------------------
APPEARANCES:

GREEN & SEIFTER, PLLC         ROBERT K. WEILER, ESQ.
Attorneys for The Harness Horse Association of   Of Counsel
   Central New York, Inc.         MICHAEL BALANOFF, ESQ.
One Lincoln Center            Of Counsel
Syracuse, New York 13202

STROOCK & STROOCK & LAVAN LLP   CHRISTOPHER DONOHO, ESQ.
Attorneys for Oneida Entertainment, LLC     Of Counsel
180 Maiden Lane            KENNETH PASQUALE, ESQ.
New York, New York 10038-4982      Of Counsel

HARRIS BEACH, LLP          LEE E. WOODARD, ESQ.
Attorneys for Debtors            Of Counsel
One Park Place
300 S. State Street
Syracuse, New York 13202

MCGUIREWOODS LLP        JAMES P. RICCIARDI, ESQ.
Attorneys for Vernon Downs Acquisition, LLC   Of Counsel
1345 Avenue of the America, 7th Floor     SHAWN R. FOX, ESQ.
New York, NY 10105           Of Counsel

BOND, SCHOENECK & KING, LLP    STEPHEN A. DONATO, ESQ.
Attorneys for Official Committee of Unsecured   Of Counsel
  Creditors
One Lincoln Center
Syracuse, New York 13202-1355

GUY A. VAN BAALEN, ESQ.
Assistant U.S. Trustee
10 Broad Street
Utica, New York 13501


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


### MEMORANDUM-DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER


Presently under consideration by the Court is a request filed on December 2, 2005, on

behalf of the Harness Horse Association of Central New York, Inc. (the "Association" or

"Horsemen") pursuant to §§ 503(b) and 507(a)(1)[1] of the U.S. Bankruptcy Code, 11 U.S.C. §§

101-1330 ("Code"), for the allowance of an administrative expense of $9,585,536 and an order

directing Mid-State Raceway, Inc. ("Raceway" or "Debtor") to make immediate payment of the

claim.[2]  On December 13, 2005, an objection was filed on behalf of Vernon Downs Acquisition,

LLC ("VDA").  A similar objection was filed on behalf of the Debtors on December 22, 2005.

On December 27, 2005, Oneida Entertainment LLC ("Oneida") filed a document in support of

the Debtor's objection.[3]  A response to the objections was filed on behalf of the Association on

---

[1] The Association's request is considered under the U.S. Bankruptcy Code as it existed prior to October 17, 2005, the date the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 took effect, amending the prior law as it existed on the date the Debtor and Mid-State Development Corporation (hereinafter jointly referred to as the "Debtors") filed their petitions, to wit: August 11, 2004.

[2] The Court will treat the Association's "request" as a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure for purposes of this Decision.

[3] On December 27, 2005, the Association filed a response in opposition to Oneida's joinder in support of the Debtors' objection.  Based on representations made to the Court on December 28, 2005, that the Association and Oneida have reached a settlement regarding the claim of the Association, the Court believes it unnecessary to address the Association's response. *See also* Memorandum of Law, filed by the Association on January 6, 2006, at Footnote 1.

3

December 27, 2005. On December 29, 2005, a reply in opposition to the Association's request

was filed on behalf of the Official Committee of Unsecured Creditors (the "Committee").

The Association's request was considered by the Court on December 28, 2005, at a

special term of the Court in Utica, New York.  Following oral argument by the parties, the Court

afforded them an opportunity to file memoranda of law.[4]  The matter was submitted for decision

on January 6, 2006.


## JURISDICTIONAL STATEMENT


The Court has core jurisdiction over the parties and subject matter of this contested matter

pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A), (L) and (O).


## FACTS


### Interested Parties

As noted previously, the Debtors filed voluntary petitions pursuant to chapter 11 of the

Code on August 11, 2004.[5]  On August 12, 2004, the Court signed an Order granting joint

---

[4] VDA is a co-proponent of a plan of reorganization, along with the Debtors. The Association raised the issue of VDA's standing to object to its request.  The Court concludes that VDA is certainly a party in interest to these proceedings and, as will be discussed herein, as a plan proponent has a financial interest in the claim allowance process. Furthermore, the Debtors and VDA filed a joint memorandum of law on January 6, 2006, in support of their position, which renders the Association's argument moot.

[5] An involuntary chapter 11 petition had been filed against Raceway in the U.S. Bankruptcy Court for the District of Nevada on August 9, 2004 (Case No. 04-52382).  The filing

4

administration of the two cases.  Raceway owns all of the stock of Mid-State Development.  Up

until July 23, 2004, Raceway operated the Vernon Downs racetrack in Vernon, New York.[6] Mid-

State Development Corporation operates an adjacent hotel, food and proposed video gaming

business.

The Association is duly licensed by the New York State Racing and Wagering Board as

the exclusive representative of the owners, trainers, and drivers of harness horses at Vernon

Downs race track pursuant to § 307 of the New York Racing, Pari-Mutuel Wagering and

Breeding Law.  *See* Objection to Use of Cash Collateral, filed by the Association on August 23,

2004 (Docket Nos. 30 and 97).  Pursuant to an agreement, dated December 1, 2003, Raceway and

the Association agreed to certain terms for the 2004 and 2005 racing seasons ("December 2003

Agreement").  According to the December 2003 Agreement, "the Association has been

recognized as the exclusive bargaining agent for all owners, trainers, and drivers engaged in

harness racing at Vernon Downs."  *See* December 2003 Agreement at 1.

VDA was organized by Jeffery Gural ("Gural") and TrackPower, Inc. to facilitate the

acquisition of the Debtors.  On June 14, 2005, the Debtors, along with VDA, as co-proponents,

filed their First Joint Plan of Reorganization, along with their disclosure statement.

The Committee was appointed in the Debtors' cases by the United States Trustee on

October 27, 2004.

---

in the Northern District of New York was in response to the involuntary petition.  The
involuntary case was dismissed by Order of the Nevada Bankruptcy Court on September 29,
2004, and the case was closed on November 2, 2004.

[6] Allegedly, horse racing and simulcasting operations ceased on July 23, 2004, when
Raceway's licenses were suspended.

**Factual Background**

On August 30, 2004, the Debtors filed a motion pursuant to Code § 365 to reject the

December 2003 Agreement, which according to the Debtors "delineated the rights and duties of

each party concerning racing and the division of funds raised therefrom."  *See* Affidavit of Lee

E. Woodard, Esq., sworn to August 30, 2004, at ¶ 8.  It was the Debtors' position at the time that

the agreement was burdensome and had the potential to "put a strangle hold on all operations of

the Debtors."  *Id.* at ¶ 10.  The Association filed an objection to the motion on September 23,

2004.  The motion was originally scheduled to be heard on September 28, 2004, and was

adjourned several times at the request of the parties.  Ultimately, a hearing was held on April 5,

2005, in Syracuse, New York, at which it was represented to the Court that the parties were "very

close" to settling the matter with a stipulation "in the next few days" and the motion was taken

off the Court's calendar.  On May 10, 2005, Raceway and the Association executed a stipulation

("Stipulation") essentially assuming the December 2003 Agreement.  An Order approving the

Stipulation was signed by the Court on May 20, 2005.

Under the terms of the Stipulation, Raceway was deemed to have assumed the December

2003 Agreement, attached to the Stipulation as Exhibit "A," subject to the terms and conditions

of the Stipulation.  In the Stipulation, the Raceway acknowledged its default under the December

2003 Agreement because (a) Raceway had not conducted the number of Race Days required by

the December 2003 Agreement in 2004; (b) Raceway did not pay the aggregate sum of

$128,706.00 in dishonored and unissued checks for purses owed to horse owners, drivers, and

trainers who raced during the 2004 Racing Season and remained unpaid in amounts set forth in

Exhibit "B", attached to the Stipulation; (c) Raceway did not pay the Association the sum of

6

$3,000 per month for July 2004 through May 2005 totaling $33,000, together with $19,904 in other charges for a total of $52,904, which represented "Unpaid Administrative Distribution" as defined in the December 2003 Agreement; and (d) Raceway did not deposit in the Purse Reserve Account, as defined in the December 2003 Agreement, the sum of $384,313, which included the sum of $86,468 Raceway was holding at the time and represented monies, which the Association claimed was its property.

Paragraph 3 of the Stipulation required[7] that no later than June 1, 2005, Raceway "(a) pay to the Unpaid Horsemen all Unpaid Horsemen's Purses in the aggregate amount of $128,706; (b) pay to the Association the Unpaid Administrative Disbursements [of] $52,904 plus Administrative Disbursements that accrue between the date of this Stipulation and the date of payment hereunder and (c) deposit into the Purse Reserve Account the amount required to bring the balance in the account to $384,313."

According to ¶ 4 of the Stipulation, pursuant to Code § 365(b)(1)(C), Raceway granted "the Association's members and other Horsemen who race during the 2005 Racing Season" a first lien and security interest in the Purse Reserve Account. Paragraph 5 provides that "[u]pon payment and deposit of all funds required to be paid and deposited under paragraph 3 of this Agreement and performance by Raceway of all obligations of Raceway to be performed by June 1, 2005, all defaults under the Agreement shall be deemed cured."

The Stipulation provided that "[u]pon payment and deposit of all funds required to be paid and deposited under paragraph 3 of this Agreement and performance by Raceway of all

---

[7] The actual language in the Stipulation states that "Raceway <u>shall</u> . . . ." Stipulation at ¶ 3 (emphasis supplied).

obligations of Raceway to be performed by June 1, 1005, all defaults under the Agreement shall

be deemed cured." *Id.* at ¶ 5.

Paragraph 3(a) of the December 2003 Agreement was amended to provide the following:

Upon timely satisfaction by Raceway of all conditions required by Paragraph 5 of a Stipulation and Order to Assume Horseman's Agreement approved by order of the United States Bankruptcy Court Northern District of New York, Raceway shall be deemed to have satisfied its racing obligations for the 2004 Racing Season under Section 3(a) of the Agreement, which shall survive with respect to the 2004 Racing Season only, in accordance [with] terms of the Agreement dated as of December 1, 2003. For the year 2005 only and subject to the provisions of subparagraph 3(f) hereof, the live harness horse race meet for the year 2005 (the "2005 Racing Season") will commence (subject to the receipt by Raceway of its 2005 live racing licenses, as the case may be for which Debtor will file an application within five (5) days of the signing of this Stipulation by all parties) on or about June 1, 2005 (the "Commencement Date"), and will conclude after the occurrence of 96 Race Days, as defined herein (the "Conclusion Date"); provided, however, that the last day of racing will be Saturday, November 26, 2005. Raceway will guarantee 96 Race Days (as defined) during the 2005 Racing Season at the rate of at least three Race Days per week unless otherwise agreed to in writing by the parties. . . .[8]

In the interim between the execution of the Stipulation with the Association on May 10,

2005, and the entry of the Order approving said Stipulation on May 20, 2005, the Debtors filed

a motion on May 16, 2005, seeking approval of post-petition financing pursuant to Code § 364

in the amount of $675,265, pursuant to a loan agreement dated May 13, 2005, between the

Debtors and VDA. In their motion, the Debtors asserted the need for supplemental working

capital to be used for the day-to-day operations, including preparing the facilities for live racing.

An affidavit in support of the Debtors' financing motion also indicated that "[i]n addition,

paragraph 8 of the Stipulation and Order to Assume Horsemen's Agreement entered into by the

---

[8]   Paragraph 3 of the December 2003 Agreement originally provided for "not less than 120 Race Days in 2005 at the rate of at least four Race Days per week unless otherwise agreed to in writing . . . ."

8

Debtors and the Harness Horse Association of Central New York, Inc. on May 10, 2005 requires the Debtors to seek debtor in possession financing in an amount of $431,000 to operate the racetrack." *See* Affidavit of Lee E. Woodard, Esq., sworn to May 13, 2005, at ¶ 10. The budget attached to the Debtors' motion as Exhibit "B" identifies a list of items "to be completed prior to opening" of the race track in 2005, including one identified as "Fund purse account" in the amount of $461,455.

The Code § 364 motion was originally scheduled to be heard on May 24, 2005, on shortened notice. The hearing was continued to May 31, 2005, and then to June 7, 2005. By letter, dated June 7, 2005, Debtors requested a further adjournment to June 14, 2005 (Docket No. 523), when it was finally heard by the Court. At the hearing on June 14, 2005, the Court was asked by the Debtors not to consider the original loan agreement, dated May 13, 2005, but rather to approve the Revised Loan Agreement, dated June 13, 2005 between the Debtors and Southern Tier Acquisition, LLC (the "Lender").[9]

Under the terms of the Revised Loan Agreement, the Lender was to make a payment of "Tranche One," in the amount of $395,420, available to the Debtors to be "used to fully pay any amount currently due and owing the Harness Horse Association of Central New York, Inc., on account of any currently Unpaid Horsemen's Purses as defined in the So-Ordered Stipulation and Order To Assume Horsemen's Agreement entered by the Bankruptcy Court on May 20, 2005." *See* Revised Loan Agreement at ¶ I.B. Under the terms of the Revised Loan Agreement, the Debtors would be permitted to borrow "Tranche Two" in the amount of $279,845 upon "issuance of a license by the New York State Racing and Wagering Board to operate the harness track

_____

[9] Southern Tier Acquisitions, LLC is an entity also owned by Gural.

known as Vernon Downs for a 2005 season, or prior to said issuance if the second tranche is

required to effectuate the issuance of said license." *Id.* at Second introductory paragraph.

At the hearing on June 14, 2005 in connection with the Debtors' request for approval of

the Revised Loan Agreement, counsel for the Association strenuously argued that the Debtor was

choosing to unilaterally modify the Stipulation approved by this Court on May 20, 2005.

Counsel argued that in breaching the terms of the Stipulation, the Debtors were subjecting the

estate to a potential administrative expense claim in the hundreds of thousands of dollars in

damages.  Debtors' counsel explained that the monies to fund the "Second Tranche" were

available upon a simple phone request to wire the funds into the Purse Reserve Account.

Debtors' counsel indicated that because the account would not need to be funded until Raceway

obtained a license or until the New York Racing and Wagering Board required that the monies

be in the account as a condition to its considering whether to grant a license to Raceway, it had

been the Debtors' business judgment that obtaining an advance of the monies now would result

in an unnecessary monthly interest payment of approximately $2,100, as well as payment of a

3% draw on any of the loan proceeds advanced to the Debtors.

Following oral argument on June 14, 2005, the Court concluded that it would approve the

Revised Loan Agreement and allow the monies to be paid in two tranches.  The Court indicated

that it would leave it up to the Association to decide what it wanted to do in seeking an

administrative claim for damages for the alleged breach of the Stipulation.  On June 21, 2005,

the Court signed an Order pursuant to Code § 364(c) authorizing the Debtors to borrow $675,265

under the terms of the Revised Loan Agreement.

As noted above, on December 2, 2005, the Association filed its request for an

10

administrative expense claim in the amount of $9,585,536 and its request for immediate payment

of that amount by the Debtors.  Also on December 2, 2005, the Association filed an objection to

confirmation of the VDA/Debtors' Plan,[10] which previously had received the necessary

acceptance by the creditors and/or equity holders of the estate.

On December 16, 2005, the Court commenced a confirmation hearing on the

VDA/Debtors' Plan.  The hearing was continued to December 28, 2005, for further testimony.

At the hearing on December 16, 2005, Gural testified that the plan projections did not include

payment of an administrative expense claim of the Association in excess of $384,313.  *See*

Transcript of December 16, 2005 Hearing at 149-150.[11]

## ARGUMENTS

The Association asserts that the Stipulation, which provided for assumption by Raceway

of the December 2003 Agreement, as modified by the Stipulation, has been breached by

Raceway.  It is the Association's position that "[t]he Horsemen were willing to release []

unliquidated claims [for failure by Raceway to complete the 2004 racing season], but only if the

remaining funds owed were paid or otherwise secured no later than June 1, 2005."  *See*

---

[10] On September 13, 2005, VDA/Debtors filed their Third Amended Chapter 11 Plan and
Disclosure Statement ("VDA/Debtors' Plan").  On September 21, 2005, the Court signed an
Order approving the disclosure statement accompanying the VDA/Debtors' Plan.

[11] Following the confirmation hearing on the VDA/Debtors' Plan, the Court allowed the
parties an opportunity to file a stipulation of uncontested facts and memoranda of law in support
of their respective positions in lieu of closing arguments.  The confirmation of the VDA/Debtors'
Plan was submitted for decision on January 13, 2006.  On January 13, 2006, the Association filed
its memorandum of law in support of their objection to the confirmation of the VDA/Debtors'
Plan (Docket No. 991).

Association's Memorandum of Law at 2.

The Association directs the Court to ¶¶ 3, 5 and 6 of the Stipulation.  In ¶ 3, Raceway

agreed to cure its prior defaults by making payments of $128,706 to the Unpaid Horsemen, as

defined in the December 2003 Agreement and $52,904 to the Association, as well as by

depositing monies into the Purse Reserve Account to bring the balance in the account to

$384,313, "[n]o later than June 1, 2005."  Paragraph 5 further indicates that upon the payments

and deposit of funds, as identified in ¶ 3, Raceway's defaults would be deemed cured.

Furthermore, ¶ 6, amends ¶ 3(a) of the December 2003 Agreement, which addresses the "racing

calendar."  Paragraph 3(a), as amended, states that "Raceway shall be deemed to have satisfied

its racing obligations for the 2004 Racing Season "[u]pon timely satisfaction by Raceway of all

conditions required by Paragraph 5 of [the] Stipulation . . . ."  The Association argues that these

provisions provide a clear direction to Raceway concerning what must be done by June 1, 2005,

in order to cure its defaults under the terms of the December 2003 Agreement.  The Association

contends that because Raceway failed to deposit the required monies into the Purse Reserve

Account by June 1, 2005, it has breached the Stipulation and the Association is entitled to enforce

its rights under the December 2003 Agreement with respect to the 2004 racing season for

approximately $3.59 million in damages.[12]  *See* Association's Request at ¶ 4.  With respect to the

2005 racing season, the Association argues that it is also entitled to approximately $5.99 million

in damages if it is established that Raceway failed to use its best efforts in pursuing the licenses

---

[12]  Interestingly, the 2004 losses are calculated on 60% of the estimated 2005 losses given
that there were 44 days of racing out of 120 as required under the December 2003 Agreement
prior to its amendment.

for the track.[13]   In support of this argument, Association refers the Court to ¶ 1(a) of the

December 2003 Agreement in which there is reference to the fact that both Raceway and the

Association "agree to use their best efforts to promote the interests of Vernon Downs in order to

increase the attendance and handle and thereby increase the profitability to Raceway . . . ."

        The Association contends that the deposit of the monies into the Purse Reserve Account,

although it was admittedly to be used as a source of payment to the Horsemen during the 2005

racing season, which never occurred, nevertheless, was "security for the Horsemen and

represented funds earned in the 2004 racing season" before the race track was shut down.  *See*

Association's Memorandum of Law at 9.

        Raceway does not deny that it did not deposit the monies into the Purse Reserve Account

by June 1, 2005, pursuant to the terms of the Stipulation.  The Debtors/VDA assert that the

Association has not established that the failure to fund the Purse Reserve Account was a material

breach that would entitle the Association to seek damages pursuant to the December 2003

Agreement.[14]   The Debtors/VDA argue that materiality "depends, in part, on the extent to which

---

[13] Included in these damages are $1,968,500 in amounts allegedly owed pursuant to ¶ 2(h)
of the December 2003 Agreement, as well as $3,025,000 in losses alleged to have been incurred
by the horsemen for trucking based on "the assumption that horsemen were required to transport
500 horses for the year 2005 to one of five tracks for an average of 25 starts per year."  *See*
Association's Request at ¶ 4 and ¶ 5.

[14] In a letter, dated January 11, 2006, counsel for the Association objected to the Debtors'
argument that the breach of the provision requiring the deposit of monies into the Purse Reserve
Account was immaterial.  In addition, the Association takes exception to the assertion of the
defense of laches asserted on behalf of the Debtors, as well as the submission by the Debtors to
the Court of an affidavit by Debtors' counsel, together with certain correspondence with the New
York Racing and Wagering Board concerning Raceway's efforts to obtain a license.  On January
16, 2005, the Debtors and VDA filed a response objecting to the Association's request that the
Court not consider the issues of materiality and laches and also not consider the affidavit of
Debtors' counsel and the correspondence attached thereto.  Most recently by letter, dated January
19, 2005, the Association again expressed its concerns about the submission of supplemental

the injured party will be deprived of the benefit which it reasonably expected to obtain."
Debtors/VDA's Memorandum of Law at ¶ 16.  It is the Debtors/VDA's position that the monies
in the Purse Reserve Account were to "serve as <u>security</u> for the payment of future purses that
might be won by horsemen at Vernon Downs."  *Id.* at ¶ 18 (emphasis supplied in the original).
The Debtors/VDA point out that all <u>unpaid</u> purses, driver minimums and administrative
distributions for 2004 have been paid pursuant to ¶ 3 of the Stipulation.  *Id.*  Therefore, it is the
Debtors/VDA's position that the Purse Reserve Account provided no monetary benefit to the
Association unless and until a racing license for the remainder of 2004 and all of 2005 was
obtained.  Debtors/VDA argue that receipt of the license was a condition precedent to the
Association's entitlement to any of the monies in the account.[15]  While Debtors acknowledge the
obligation to put sufficient money into the Purse Reserve Account to create a balance totaling
$384,313, they contend that since licensure never occurred, no payment to the Association ever
became due.  *Id.* at 19.  Thus, the Debtors/VDA argue that the Association has not suffered any
damages.  *Id.* at ¶ 29.  Debtors/VDA also contend that if the Court were to determine that there
were any damages, they should be limited to the $384,313 that was to be placed on deposit in the

---

information and what it contended was new argument being made on behalf of the Debtors,
noting the Court's express request that any memoranda of law be filed on the same day, namely,
January 6, 2005.

   The Association contends that the issue of materiality was not raised during oral
argument.  Because the Court considers the issue of materiality an issue of law which the Court
would have considered even if it had not been raised by the Debtors in the context of an alleged
breach of the Stipulation, it must deny that portion of the Association's request.  Based on the
Decision herein, the Court also finds it unnecessary to address the Association's concerns about
the defense of laches or the submission of correspondence between Debtors' counsel and the New
York Racing and Wagering Board, which clearly constitutes hearsay.

   [15]  The Debtors' assertion of a condition precedent that they obtain a license to race in
2005 before being able to draw on "Tranche Two" to fund the Purse Reserve Account is actually
a condition found in the Revised Loan Agreement to which the Association was not a party.

Purse Reserve Account.

The Debtors/VDA also assert that judicial estoppel should prevent the Association from seeking an administrative claim for damages. It is the Debtors/VDA's position that the Court in all likelihood would not have approved the assumption of the December 2003 Agreement had it been apprized by the Association of the possibility of a potential administrative claim in the amount of $9.5 million. In support of this argument, the Debtors/VDA rely on *Nostas Assoc. v. Costich (In re Klein Sleep Products Inc.)*, 78 F.3d 18 (2d Cir. 1996) for the proposition that otherwise it may have been more appropriate to delay assumption of the December 2003 Agreement "until the moment of confirmation, when the debtor's chances of rehabilitation would finally be clear." *Id.* at 25.

### DISCUSSION

Contracting parties that agree to alter the terms of their original agreement are left with the option of resolving their differences by entering into a "substitute contract" or through an "accord and satisfaction." The remedy for a breach of the new agreement depends on its nature. A substitute contract is defined as "[a] contract made between parties to an earlier contract so that the new one takes the place of and discharges the earlier one." BLACK'S LAW DICTIONARY 349 (8th ed. 2004). Thus, a substitute contract extinguishes a claimant's prior claims upon execution of the agreement and the original claim can no longer be enforced. *See Frank Felix Assoc., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 287 n.1 (2d Cir. 1997). On the other hand, an "executory accord" is defined as "[a]n offer to give or to accept a stipulated performance in the future to

15

satisfy an obligor's existing duty, together with an acceptance of that offer."  BLACK'S LAW

DICTIONARY 17 (8th ed. 2004).    In this case, in response to the Debtors' motion seeking

authorization to reject the December 2003 Agreement, the Association agreed to accept

Raceway's payments of $128,706 in unpaid horsemen's purses and $52,904 in unpaid

administrative disbursements, as well as Raceway's deposit into the Purse Reserve Account of

sufficient monies to bring the balance in the account to $384,313 by June 1, 2005 to cure the prior

defaults by Raceway.  In exchange, Raceway agreed to assume, rather than reject, the December

2003 Agreement and to make the required payments and deposit in order to cure its prior

defaults.  The Court finds that the agreement between the parties constituted an executory accord

and not a substitute contract.

Under New York General Obligations Law § 15-501(3), applicable to the matter herein,

"[i]f an executory accord is not performed according to its terms by one party, the other party

shall be entitled to assert his rights under the claim, cause of action, contract [or] obligation . .

. which is the subject of the accord, or to assert his right under the accord."  New York General

Obligations Law § 15-501(3) (McKinney 2001).  In *Frank Felix Assoc.*, the Court of Appeals for

the Second Circuit analyzed both modern New York case law and decisions in other jurisdictions,

and concluded that "New York courts would require that any breach of an executory accord be

material before a party may sue upon the original obligation."  *Frank Felix Assoc.*, 111 F.3d at

289.

The Association bases its claim of damages in the amount of $9.5 million on the assertion

that in breaching the terms of the Stipulation by not funding the Purse Reserve Account by June

1, 2005, as required in ¶ 3 of the Stipulation, Raceway is liable for damages as an administrative

expense based not on the Stipulation but on the December 2003 Agreement.  This position has validity only if the Court determines that the breach of the Stipulation by Raceway was material.

The issue of materiality is a fact-specific inquiry that requires the Court to examine the totality of circumstances, including the special purpose of the contract, as well as "'the extent to which the injured party will be deprived of the benefits reasonably expected, the extent to which the injured party can be adequately compensated for its loss, and the good faith of the breaching party.'"  *Id.,* quoting RESTATEMENT (SECOND) OF CONTRACTS § 241(a) (1979); *see also Mackinder v. Schawk, Inc.,* Case No. 00 Civ. 6098, 2005 WL 1832385, *9 (S.D.N.Y. Aug. 2, 2005) (noting not only the above factors but also considering "the extent to which the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances.").  Also to be considered is "'the extent to which the agreement provides for performance without delay.'" *Frank Felix Assoc.,* 111 F.3d at 289, quoting RESTATEMENT (SECOND) OF CONTRACTS § 242(c).  So too, the Court must view the breach of an accord "in light of its substantial compliance with the party's other obligations under the accord." *Id.,* citing RESTATEMENT (SECOND) OF CONTRACTS § 241.

The Stipulation does not expressly state the purpose for the accord, but the Court notes that it was entered into in response to the Debtors' motion to reject the December 2003 Agreement.  Under the terms of the Stipulation, executed on May 10, 2005, the Association agreed to allow Raceway an opportunity to cure its previous default under the December 2003 Agreement, as modified, and Raceway agreed to assume it.  There is also no provision in the Stipulation indicating that the June 1, 2005 date for making the deposit into the Purse Reserve Account was somehow critical.  Indeed, the Association has not alleged that any damages were

incurred as a result of Raceway's failure to meet that particular deadline.

Based on the facts presented to the Court, it would appear that Raceway complied with a substantial portion of its obligations under the terms of the Stipulation in that it paid the "Unpaid Horsemen" all "Unpaid Horsemen's Purses" in the aggregate amount of $128,706, and paid the Association the "Unpaid Administrative Disbursements" of $52,904, plus any disbursements that accrued between May 10, 2005 and the date of such payment. Raceway, however, admittedly failed to deposit sufficient monies in the Purse Reserve Account by June 1, 2005, to allow for a balance on deposit in the account of $384,313, namely an additional $297,845.[16] In fact, this Court did not approve the Revised Loan Agreement, specifically, "Tranche Two" which included the monies to be deposited in the Purse Reserve Account, until June 21, 2005.

At the hearing on June 14, 2005, in connection with the financing, Debtors' counsel provided "reasonable assurances" to the Court that the monies necessary to fund the Reserve Purse Account were readily accessible in that all that was required was a telephone call from Raceway and the monies would be wired into the Purse Reserve Account. According to Debtors' counsel, in spite of the terms of the Stipulation, the Debtors determined that it was unnecessary to fund the Purse Reserve Account until Raceway had obtained a license or it became necessary

---

[16] The Court notes a discrepancy between the amount provided for in the Revised Loan Agreement approved by this Court on June 13, 2005. In that document, reference is made to a second tranche of "$279,845." However, according to the terms of the Stipulation, Raceway agreed to deposit into the Purse Reserve Account sufficient monies to create a balance of $384,313, which at the time of the Stipulation showed $86,468 on deposit in the account. *See* Stipulation at ¶ 2. According to the Court's calculation, the difference between $384,313 and $86,468 amounts to $297,845, not $279,845. The Court observes that the difference between the total principal requested in the Revised Loan Agreement, namely $675,265, and the amount of "Tranche One," namely $395,420, does equal $279,845, however.

to deposit the monies into the account in order to effectuate getting a license from the New York State Racing and Wagering Board, thus saving the Debtors approximately $2,100 per month in unnecessary interest payments.[17]

The unilateral approach taken by the Debtors in failing to make the deposit required by the Stipulation and their failure to seek approval of an amendment to the terms of the Stipulation raises questions concerning whether their actions comport with standards of good faith and fair dealing.  Their actions, even if based on their "best business judgment," demonstrated an intentional disregard for this Court's Order approving the Stipulation.  While the Court does not condone such unilateral action on the Debtors' part, nevertheless, in the context of the request currently pending, the Court must consider it as only one factor, albeit a fairly significant one, in its analysis.

Under the circumstances as presented to the Court, it concludes that Raceway's breach of the Stipulation was not a material breach.  The Court wishes to make it clear that its conclusion that there was no material breach of the Stipulation is based, *inter alia,* on the finding that the Debtors' are in a position to deposit the necessary funds into the Purse Reserve Account.  If this conclusion is proven to be unfounded and the Debtors are unable or unwilling to make the deposit, the Court, upon motion by the Association, will conduct an evidentiary hearing on the

---

[17]  While the Association has suggested that the Debtors may not have used their best efforts to obtain a license for the 2005 racing season, the Court does not consider the issue an essential condition of the Stipulation.  Rather, the language referring to "best efforts" is found in the December 2003 Agreement, which was executed at a time when Raceway did have a license.  The Court finds nothing in the language of the Stipulation that expressly sets forth such a requirement.  Consideration of that argument by the Association, and its suggestion that there is a need for an evidentiary hearing in that regard, only has relevance in the event that the Court were to determine that the failure to fund the Reserve Purse Account was a material breach of the Stipulation.

issue of damages based on the alleged breach of the December 2003 Agreement.

Thus, the Association's request for an administrative expense claim for damages in the amount of $9,585,536 based on the December 2003 Agreement must be denied.  However, consistent with the Court's conclusion, it also believes it appropriate and necessary that Raceway comply with the Stipulation insofar as the Purse Reserve Account is concerned in order to provide the Association with all of the benefits it reasonably expected when it entered into the Stipulation.  Accordingly, the Court will require that Raceway deposit the appropriate amount in the account so as to create a balance therein of $384,313.

Based on the foregoing, it is hereby

ORDERED that the request of the Association for the allowance of an administrative expense claim of $9,585,536 and immediate payment thereof is denied without prejudice; it is further

ORDERED that Raceway deposit into the Purse Reserve Account sufficient monies so as to create a balance in the amount of $384,313 within ten (10) days of the date of this Order.

Dated at Utica, New York

this 30th day of January 2006

/s/    Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge