UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

      MID-STATE RACEWAY, INC.           CASE NO. 04-65746
                                         Chapter 11
                 Debtor         Jointly Administered
--------------------------------------------------------
IN RE:
      MID-STATE DEVELOPMENT
      CORPORATION              CASE NO.  04-65745

                 Debtor
--------------------------------------------------------
APPEARANCES:

HARRIS BEACH, LLP             LEE E. WOODARD, ESQ.
Attorneys for Debtors           DAVID M. CAPRIOTTI, ESQ.
One Park Place                KELLY C. GRIFFITH, ESQ.
300 S. State Street             Of Counsel
Syracuse, New York 13202

MCGUIREWOODS LLP          JAMES P. RICCIARDI, ESQ.
Attorneys for Vernon Downs Acquisition, LLC   SHAWN R. FOX, ESQ.
1345 Avenue of the America, 7th Floor    Of Counsel
New York, NY 10105
        and
625 Liberty Avenue             MARK E. FREEDLANDER, ESQ.
23rd Floor, Dominion Tower        RONALD W. CROUCH, ESQ.
Pittsburgh, PA 15222            Of Counsel

GREEN & SEIFTER, PLLC        MICHAEL J. BALANOFF, ESQ.
Attorneys Harness Horse Association of   ROBERT K. WEILER, ESQ
 Central New York, Inc.          Of Counsel
One Lincoln Center, Suite 900
110 West Fayette Street
Syracuse, NY 13202

MENTER, RUDIN & TRIVELPIECE, P.C.   JEFFREY A. DOVE, ESQ.
Attorneys for Vestin Mortgage, Inc.    Of Counsel
500 S. Salina Street, Suite 500
Syracuse, New York 13202-3300

COSTELLO, COONEY & FEARON, PLLC
Attorneys for County of Oneida
205 South Salina St.
Syracuse, NY  13202-1327

ANTHONY R. HANLEY, ESQ.
Of Counsel

STROOCK & STROOCK & LAVAN LLP
Attorneys for Oneida Entertainment, LLC
180 Maiden Lane
New York, New York 10038-4982

CHRISTOPHER DONOHO, ESQ.
KENNETH PASQUALE, ESQ.
Of Counsel

HISCOCK & BARCLAY, LLP
Attorneys for Oneida Entertainment, LLC
One Park Place
300 South State Street
P.O. Box 4878
Syracuse, New York 13221-4878

J. ERIC CHARLTON, ESQ.
Of Counsel

GUY A. VAN BAALEN, ESQ.
Assistant U.S. Trustee
10 Broad Street
Utica, New York 13501

BOND, SCHOENECK & KING, LLP
Attorneys for Official Committee of Unsecured
    Creditors
One Lincoln Center
Syracuse, New York 13202-1355

STEPHEN A. DONATO, ESQ.
Of Counsel

PRYOR CASHMAN SHERMAN &
        FLYNN, LLP
Attorneys for Raceway Ventures, LLC
410 Park Avenue
New York, NY 10022

RICHARD LEVY, JR., ESQ.
Of Counsel

THOMAS PAUL HUGHES, ESQ.
Chapter 7 Trustee for Patrick Bennett case
23 Oxford Road
New Hartford, NY 13413

PATRICK R. BENNETT
PRO SE
F.C.I. Loretto, P.O. Box 1000
Loretta, PA  15940

**Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge**

## MEMORANDUM-DECISION, FINDINGS OF FACT,
## CONCLUSIONS OF LAW AND ORDER

The Court has under consideration confirmation of the Third Modified Amended Joint Plan of Reorganization (the "VDA/Debtors' Plan") proposed by Mid-State Raceway, Inc. ("Raceway") and Mid-State Development Corporation (hereinafter collectively, the "Debtors") and Vernon Downs Acquisition, LLC ("VDA") .

On December 16, 2005, the Court commenced an evidentiary confirmation hearing on the VDA/Debtors' Plan. The hearing was continued to December 28, 2005, for further testimony. The Court allowed the parties an opportunity to file a stipulation of uncontested facts[1] and memoranda of law in support of their respective positions in lieu of closing arguments.

VDA/Debtors filed a joint memorandum of law in support of confirmation of the VDA/Debtors' Plan on January 13, 2006. A statement in support of confirmation of the VDA/Debtors' Plan was filed by the Official Committee of Unsecured Creditors (the "Committee") on January 13, 2006. A memorandum of law was also filed that day by Dominick Giambona ("Giambona") and John J. Signorelli ("Signorelli") in support. In addition, a letter, dated January 13, 2006, was filed by Gary A. Greenberg ("Greenberg"), a shareholder of Raceway.[2]

A memorandum of law in support of its objection to confirmation of the VDA/Debtors' Plan was filed on behalf of the Harness Horse Association of Central New York, Inc. (the

---

[1]  At a hearing held on a separate motion in the case on January 6, 2006, the parties advised the Court that they had been unable to reach a stipulation as to uncontested facts and none would be forthcoming.

[2]  Although docketed as a "Supplemental Objection to Confirmation of Plan of Oneida Entertainment LLC," it is clear that it was intended to express support for the confirmation of the VDA/Debtors' Plan.

4

"Association") on January 13, 2006.   In addition, a brief in support of its objection to confirmation of the VDA/Debtors' Plan was filed on behalf of Oneida Entertainment LLC ("Oneida") on January 13, 2006.[3]

The confirmation of the VDA/Debtors' Plan was submitted for decision on January 13, 2006.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A), (L) and (O).

## FACTS

### Interested Parties

The Debtors are New York corporations that are primarily involved in the operation of a harness horse racing track commonly known as Vernon Downs and the related adjacent hotel

---

[3]   On January 31, 2006, Oneida filed a letter, dated January 30, 2006, in which it requested  withdrawal of its objection to the VDA/Debtors' Plan on the basis that "Oneida and VDA have resolved all issues with respect to the [o]bjection." (Docket No. 1019).  Oneida's counsel also indicates in the letter that it has agreed to contribute $20 million in debt and equity to the entity that will control both Vernon Downs and Tioga Downs.  Accordingly, the Court will not address those specific objections.  However, that does not relieve the Court of its duty to conduct an independent analysis concerning compliance with § 1129 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code").

and catering facilities. Raceway operates the race track.[4] Mid-State Development operates the adjacent hotel and catering facilities. Raceway owns the real property on which the hotel is located and also owns all of the stock of Mid-State Development.

Jeffrey Gural ("Gural") is the managing member of VDA, which was organized by Gural to facilitate the acquisition of the Debtors. VDA is comprised of TrackPower, Inc. and Southern Tier Acquisition, LLC, another company formed by Gural in November 2003 to acquire, develop and operate Tioga Park as a licensed race track.[5]

Oneida is a creditor in the case based on its purchase of certain claims from various creditors of the Debtors. Oneida is a joint venture between an investment fund managed by Plainfield Asset Management LLC and Oneida Capital LLC. As will be discussed below, Oneida filed a competing chapter 11 plan.

The Association is duly licensed by the New York State Racing and Wagering Board as the exclusive representative of the owners, trainers, and drivers of harness horses at Vernon Downs race track pursuant to § 307 of the New York Racing, Pari-Mutuel Wagering and Breeding Law. *See* Objection to Use of Cash Collateral, filed by the Association on August 23, 2004 (Docket Nos. 30 and 97).

Giambona is an unsecured creditor and shareholder of the Debtors. Signorelli also is a

---

[4] Allegedly, horseracing and simulcasting operations ceased on July 23, 2004, when Raceway's licenses were surrendered.

[5] Ultimately, TrackPower and Southern Tier Acquisition, LLC formed Tioga Downs Racetrack, LLC ("TDR"), which in turn purchased the assets of Tioga Park, LLC, a former chapter 11 debtor with racing facilities located in Nichols, New York. *See* VDA Exhibit 5 ("Contribution Agreement").

6

shareholder of the Debtors, as is Greenberg.

The Committee was appointed in the Debtors' cases by the United States Trustee on October 27, 2004 (Docket No. 149).

**Background of the Case**

The Debtors filed voluntary petitions pursuant to chapter 11 of the Code on August 11, 2004.[6] On August 12, 2004, the Court signed an Order granting joint administration of the two cases.

On January 31, 2005, the Debtors filed an application requesting that the Court grant them an extension of the exclusivity period to file a plan from a deadline of February 1, 2005, to April 4, 2005, and an extension of the exclusivity period for soliciting acceptance of the plan until sixty days thereafter. The application was to be heard on February 22, 2005. On February 21, 2005, the Debtors filed a plan and disclosure statement. On March 9, 2005, the Court issued its Memorandum Decision, Findings of Fact, Conclusions of Law and Order (Docket No. 385), denying the Debtors request for an extension of the exclusivity period to solicit acceptances of their plan, the balance of their application having been rendered moot upon the filing of the plan and disclosure statement.

The Debtors' disclosure statement was scheduled for a hearing on April 26, 2005. The hearing was consensually adjourned to May 25, 2005 and again to July 5, 2005. In the interim, on June 14, 2005, the Debtors and VDA filed their First Joint Plan of Reorganization, along with

---

[6] An involuntary chapter 11 petition had been filed against Raceway in the U.S. Bankruptcy Court for the District of Nevada on August 9, 2004 (Case No. 04-52382). The filing in the Northern District of New York was in response to the involuntary petition. The involuntary case was dismissed by Order of the Nevada Bankruptcy Court on September 29, 2004, and the case was closed on November 2, 2004.

their Disclosure Statement for the First Joint Plan of Reorganization.  On July 14, 2005, a chapter 11 plan of reorganization (Docket No. 555) was filed on behalf of All Vernon Acquisition, LLC ("AVA"), All Capital, LLC ("AC"), and Shawn Scott ("Scott") (hereinafter jointly referred to as the "Scott entities"), as well as on behalf of Raceway Ventures, LLC.  Their disclosure statement was filed on July 20, 2005 (Docket No. 564).  On August 3, 2005, VDA/Debtors filed their First Modified Amended Plan and Amended Disclosure Statement (Docket Nos. 590 and 591).  On August 4, 2005, the Scott entities and Raceway Ventures filed their First Amended Joint Plan and First Amended Disclosure Statement (Docket Nos. 602 and 603). On August 16, 2005, the Scott entities and Raceway Ventures filed their Second Modified Amended Plan and Second Amended Disclosure Statement (Docket Nos. 625 and 626).  By Letter Decision and Order, dated August 22, 2005, the Court approved the disclosure statements of both the Scott entities/Raceway Ventures and the VDA/Debtor entities.

In the interim, on August 17, 2005, Oneida filed a plan of reorganization and disclosure statement (Docket Nos. 635 and 636).  On September 13, 2005, Oneida filed its First Amended Chapter 11 Plan, as well as its disclosure statement (Docket Nos. 701 and 703).  On the same day, VDA/Debtors filed their Third Amended Chapter 11 Plan and Third Amended Disclosure Statement (Docket Nos. 696 and 697).  Attached to VDA/Debtors' Third Amended Disclosure Statement was what was referred to as the "Scott Settlement," which was entered into on September 8, 2005, and which provided for the withdrawal of the plan filed on behalf of the Scott entities/Raceway Venture.  Under the terms of the Scott Settlement, the plan filed by the VDA/Debtors was to proceed to confirmation ("VDA/Debtors' Plan"). On September 21, 2005, the Court signed an Order approving the VDA/Debtors' Third Amended Disclosure Statement,

8

as well as the disclosure statement filed by Oneida.  The September 21st Order fixed the date for a hearing to consider confirmation of the plans as December 16, 2005.  Any objections to confirmation were to be filed by December 2, 2005.  In addition, the September 21st Order also set October 31, 2005, as the deadline for the receipt of ballots.

On November 18, 2005, the Executive Director of Financial Balloting Group, LLC,[7] Jane Sullivan ("Sullivan"), filed an affidavit, sworn to November 9, 2005, certifying the tabulation of acceptances, rejections and preferences as to both plans.[8]  On December 15, 2005, Sullivan filed an amended affidavit, sworn to on December 14, 2005.  According to the latter, Classes 3, 4, 5A and 5B all accepted the VDA/Debtors' Plan.  Classes 3, 4, 5A and 5B voted to reject the Oneida Plan.

Objections to the confirmation of the VDA/Debtors' Plan were filed on behalf of Oneida, as well as the Association prior to the hearing on confirmation.  In addition, an objection was filed by Patrick R. Bennett ("Bennett"), who described himself as a "former majority shareholder of Mid-State Raceway Inc., holding claims in excess of $3,000,000 in this case . . . ."  *See* Bennett's Objection to Confirmation of Either Submitted Plan of Reorganization (identified by Bennett as that filed by the Debtors/VDA and that filed by the AVA entities) (Docket No. 844).[9]

---

[7]  Financial Balloting Group was appointed by the September 21st Order of the Court to act as Ballot Agent.

[8]  Although not all classes were entitled to vote for the plans, pursuant to Code § 1129(c) the ballot allowed for an expression of preference for either the VDA/Debtors' Plan or the Oneida Plan by all seven classes of creditors and equity holders, as well as by administrative creditors.

[9]  At the confirmation hearing held on December 16, 2005, the Court provided Bennett with an opportunity to present his objections telephonically from the Federal Correctional Institution at Loretto, Pennsylvania, where he is presently incarcerated.  The Court concluded that Bennett lacked standing to assert an objection based on his claims concerning ownership of certain equipment located at the hotel operated by the Debtors because, in the opinion of the

## VDA/DEBTORS' PLAN

Classification of Claims and Equity Interests (Article IV of the VDA/Debtors' Plan)

The VDA/Debtors' Plan classifies the claims as follows:

Class 1 - Non-tax priority claims - unimpaired and not entitled to vote - to be paid in full on the Effective Date.[10]

Balloting results: 99.95% in dollar amount and 75% in number of those who submitted preferences, preferred the VDA/Debtors' Plan.

Class 2 - Statutory real estate claims are to be paid in accordance with Code § 506(b) on or as soon as practicable after the Effective Date, but in no event later than fifteen (15) days following the Effective Date - unimpaired and not entitled to vote.

Balloting results: no preferences submitted[11]

---

Court, those claims belonged to the trustee in Bennett's chapter 7 case, filed on September 5, 1997. Bennett filed a motion for reconsideration of that decision on December 21, 2005. The motion was heard on January 31, 2006, and denied by the Court.

Bennett also asserted a possible claim based on his present involvement in litigation against Raceway in the U.S. District Court for the District of Maryland in connection with a franchise agreement with Choice Hotels for which services allegedly were provided to Raceway. That particular aspect of the action in Maryland has been stayed as a result of the Debtors' bankruptcy. Depending on the ultimate outcome, arguably Bennett could have a claim against the Debtors which would have to be addressed.

[10] "Effective Date" is defined in the VDA/Debtors' Plan as "the earlier of sixty (60) days following the date on which the Confirmation Order becomes a Final Order or the date on which the last condition precedent under Section 10.2 of the Plan has been satisfied or waived. In the event that the Effective Date has not occurred by February 28, 2006, the Confirmation Order shall be deemed revoked and of no force or effect." Article I, § 1.25 of the VDA/Debtors' Plan. The Court would observe that this last sentence is legally unenforceable and, in the view of the Court, null and void.

[11] At the confirmation hearing on December 16, 2005, VDA/Debtors' counsel represented to the Court that the County of Oneida was about to pass a resolution which would transfer the ownership of the real property to the reorganized debtors upon payment of those taxes in full. *See* Transcript of December 16, 2005 hearing ("Tr1.") at 21, Lines 1-8. In their Memorandum of Law, VDA/Debtors indicate that the County of Oneida passed the resolution whereby upon payment of its Class 2 claim, it will reconvey the real property to VDA, not the Reorganized Debtors. *See* VDA/Debtors' Joint Memorandum of Law, filed January 13, 2006, at 4.

Class 3 - Mechanics lien claims - impaired - to be paid the allowed amount of their claims on the Effective Date but in no event later than 15 days following the Effective Date.

> Balloting results: 100% in dollar amount of Class 3 claimants who voted, voted to accept the VDA/Debtors' Plan. 100% in numerosity of those who voted, voted to accept the VDA/Debtors' Plan. 100% of those who submitted ballots preferred the VDA/Debtors' Plan.

Class 4 - Secured claim of Vestin of $24.5 million.  On the Effective Date, the Reorganized Debtors are to execute a Participation New Note, which is to mature six months from the date of execution.  Raceway has the option of purchasing a six month extension of the New Note for a fee of $250,000.  The New Note is 100% guaranteed by Gural and 50% by Nevada Gold & Casinos, Inc.  On the Effective Date, Raceway is also to pay $500,000 to Vestin as prepaid interest on the New Note.

Scott is to receive a Participation New Note in the amount of $2.86 million on the Effective Date, which is to mature six months from the date of execution.  Raceway has the option of purchasing a six month extension of the New Note for a fee of $26,550.  The New Note is 100% guaranteed by Gural and 50% by Nevada Gold & Casinos, Inc.  On the Effective Date, Raceway is also to pay $53,100 to Scott as prepaid interest on the New Note.   The subrogation claim of Scott for $205,784 for payment of Vestin's legal fees is to be treated in the same manner and have the same terms as the Participation New Note.  There is also a provision for additional payment of $550,000 in the event that the VDA/Debtors' Plan is confirmed and video lottery terminal ("VLT") revenues exceed certain amounts during the first 24 months of VLT operations.

Raceway Ventures et al. are to receive a New Note in the amount of $1.2 million on the Effective Date, which is to mature six months from the date of execution.  Raceway has the option of purchasing a six month extension of the New Note for a fee of $15,000.  Raceway Ventures et al. are also to receive an additional $300,000 in the event that VLT revenues exceed $58 million during any consecutive 12 month period during the first 24 months of VLT operations.  In addition, payment on Raceway Ventures et al.'s unsecured claim in the amount of $900,000 is to be deferred until 90 days after the VLTs become operational.

> Balloting results: 100% in dollar amount of Class 4 claimants who voted, voted to accept the VDA/Debtors' Plan. 100% in numerosity of those who voted, voted to accept the VDA/Debtors' Plan. 100% of those who submitted ballots preferred the VDA/Debtors' Plan.

Class 5A - Unsecured creditors of Raceway - impaired.
Class 5B - Unsecured creditors of Mid-State Development - impaired

> Anticipated that Allowed Claims of Class 5A and 5B will receive 100% dividend. However, the VDA/Debtors' Plan actually provides that they are to be paid in cash on the Effective Date payment in the greater amount of (i) $2.8 million in the

aggregate paid to Allowed Class 5A Claims and Allowed Class 5B Claims or (ii) an amount necessary to pay Allowed Class 5A and Class 5B Claims ninety (90%) of their respective Allowed Claims . *See* Tr1. at 22, Lines 21-24.

Balloting results - Class 5A - 99.7% in dollar amount who voted, voted to accept the VDA/Debtors' Plan; 63.1% in numerosity of those who voted to accept the VDA/Debtors' Plan; 99.7% in dollar amount of those who submitted ballots preferred the VDA/Debtors' Plan.

Balloting results - Class 5B - 99.85% in dollar amount who voted, voted to accept the VDA/Debtors' Plan; 60.0% in numerosity of those who voted to accept the VDA/Debtors' Plan; 99.85% in dollar amount of those who submitted ballots preferred the VDA/Debtors' Plan.

Class 6 - Equity interest in Raceway - impaired - They are to receive nothing. The right to cram down the interests in the class was reserved at Article 5.5. of the plan.[12]

Balloting results - 78.12% of the aggregate shares expressed a preference for the VDA/Debtors' Plan.

Class 7 - Equity interest in Mid-State Development - unimpaired.  Mid-State Development will continue as a wholly owned subsidiary of Raceway - not entitled to vote and no preferences expressed.

While administrative claims are unclassified, they are to be paid on the Effective Date of the VDA/Debtors' Plan.  Article III, § 3.2 of the VDA/Debtors' Plan.  In the case of professional compensation and expense reimbursement claims, they are to be paid on the later of the Effective Date or the date of final approval of such fees.  *Id.* at § 3.2(c).

Organization and Management Postconfirmation

Under the terms of the Plan, both "Reorganized MSR [Mid-State Raceway]" and

"Reorganized MSD [Mid-State Development]" will exist as separate corporate entities.  *See* § 6.1

of the VDA/Debtors' Plan.  Reorganized MSD is to be a wholly owned subsidiary of Reorganized

MSR.  *Id.*

---

[12]  On December 2, 2005, the Debtors filed their application seeking, pursuant to Code § 1129(b)(1), to cram down Class 6, which was deemed to have rejected the VDA/Debtors' Plan (Docket No. 853).  The Debtors' motion was unopposed.

At the confirmation hearing held on December 16, 2005, Gural testified that Edward M. Tracy ("Tracy") is currently serving as CEO of the Debtors.  Tracy has also served as Director and CEO of TrackPower since May 27, 2005.  Gural also testified that he too is currently slated to hold a management position with the reorganized debtors as Chief Executive Officer.  Gural testified that ultimately it was intended that a management team be put in place that would run both the "Tioga Downs Complex" and the "Vernon Downs Complex."  Gural testified that he anticipated getting a license for Tioga Downs before the end of 2005 and intended to use it to operate Vernon Downs.

American Racing and Entertainment, LLC ("American Racing") is alleged to have been formed "to own, hold, develop, operate, lease, transfer, sell, exchange, improve or otherwise dispose of all or any part of the "Tioga Downs Complex" and the "Vernon Downs Complex." *See* VDA Exhibit 4 (Operating Agreement of American Racing and Entertainment, LLC, dated August 24, 2005) at ¶ 2.1;  *see also* Tr1. at 129, Lines 7-14.  The "Members" of American Racing include Nevada Gold, NY, Inc. (50% ownership in American Racing), TrackPower, Inc. (25% ownership) and Souther Tier Acquisition II, LLC ("Southern Tier") (25% ownership).  VDA Exhibit 4 at ¶ 3.1.

On or about November 8, 2005, Nevada Gold NY, Inc. and VDA executed a Vernon Downs Management Agreement ("Management Agreement").  *See* VDA Exhibit 6.  In the Management Agreement, VDA is identified as the "Owner" and Nevada Gold NY, Inc. is identified as the "Manager."  The document also indicates that an "Operating Agreement" was executed the same day by and among Nevada Gold NY, Inc., TrackPower and Southern Tier as "Members."  The Management Agreement further states that the "Owner is attempting to acquire

13

the Project [Vernon Downs], and, if successful, intends to secure both racing and video lottery terminal licenses for the harness track, renovate the existing facilities and add new facilities . . . ." *Id.* Under the terms of the Management Agreement, the Manager is to be compensated based on Net Revenues as defined therein. *Id.* at ¶ 7.4.

Means of Implementation of the VDA/Debtors' Plan (Article XI of the Plan)

VDA is to contribute $11.3 in capital in exchange for 100% of the newly issued common stock of Reorganized MSR on the Effective Date. *See* § 6.6(a) of the VDA/Debtors' Plan. There is also to be a subordinated loan of $3 million from VDA. *Id.* at §§6.6(c). Also envisioned is the possibility of a third loan identified as an "effective date loan." *Id.* at § 6.6(d). Gural testified that at the time the Disclosure Statement was filed it was estimated that approximately $14.3 million would be needed in cash to emerge from chapter 11. Tr1. at 100, Lines 6-10. He further testified that $11.3 million of those monies would be used for distribution under the terms of the VDA/Debtors' Plan, operations and other expenses. Tr1. at 138, Lines 16-18.

In order to finance those monies, Gural testified that VDA's first choice would be to have CIBC, a subsidiary of Canadian Imperial Bank, make available a $70 million loan for both Tioga Downs and Vernon Downs and a $10 million revolving loan. Tr1. at 100, Lines 13-17. This would be in addition to the monies invested by VDA to purchase the 100% equity in the Reorganized Debtors. *Id.*, Lines 17-18. Gural testified that CIBC is now out in the marketplace trying to place the loan, and that it was anticipated that CIBC would be able to raise the monies by late January. *Id.* at Lines 18-21.

As a backup Gural has obtained a commitment from RCG Longview II, L.P. ("RCG"),

"who are friends of mine . . . who have agreed to give us $15 million bridge loan just for Vernon, if we need it." *See id.* at Lines 21-24 and VDA Exhibit 7. According to Gural, obtaining the $70 million loan would allow them to pay off Vestin, Scott and Mercer; otherwise, with only the $15 million bridge loan from RCG, they would not pay Vestin, Scott or Mercer since they have no obligation to do so for six months to a year, depending on whether an extension is requested by the reorganized Debtors.[13]

On cross-examination by Oneida's counsel, Gural acknowledged that he does not have any written commitment for the $70 million financing. Tr1. at 119, Lines 19-21. In fact, he indicated he has no proposal/commitment for financing at all. *Id.* at 24-25. He acknowledged that Vernon Downs would serve as collateral for the $65 - $70 million loan. With respect to the bridge loan from RCG, Gural testified that it was for four months (the minimum period for which Longview would make a loan) at 12% interest and that at the end of four months he would be able to seek an extension. Gural indicated that his real concern with regard to the bridge loan was the fact that he was prohibited from paying it back before the four months even if CIBC was able to secure the $70 million shortly after the loan from RCG. Tr1. at 140, Lines 2-8. Gural acknowledged that the loan from RCG would be subject to the consent of Vestin, Scott, Mercer ("Senior Debt"), which Gural had not obtained. He also acknowledged that he had not complied with certain conditions in the commitment letter from RCG (VDA's Exhibit 7), including obtaining title insurance, survey, unconditional certificate of occupancy, engineering report, etc. Tr1. at 142-143.

---

[13] The Court notes that at the evidentiary confirmation hearing, no one representing either CIBC or RCG testified regarding any proposed funding to support the VDA/Debtors' Plan.

Under the terms of the VDA/Debtors' Plan, VDA is also to loan Reorganized MSR "additional Cash in the sum necessary to ensure that all distributions contemplated by the Plan [are made] . . . ." *See* VDA/Debtors' Plan at § 6.6(d).  As noted previously, the VDA/Debtors' Plan also provides for a $3 million post-confirmation loan by VDA to be made on the Effective Date. *Id.* at § 6.6(c).  Gural testified that he "personally could probably write a check for four or five million dollars.  He also believed that Southern Tier, LLC, comprised of "wealthy horsemen," would be able to come up with $50 million if called upon.  Tr1. at 144, Lines 17-21.  He also testified to the fact that he had personally guaranteed $30 million in connection with the various settlements and was confident that the capital would be raised; otherwise, he would be on the "hook" for the $30 million.

H. Thomas Winn, employed by Nevada Gold & Casinos, Inc. as Chairman and CEO since it was established in 1994,[14] testified that he has over 30 years experience in seeking funding from the general capital markets.  He also testified that Nevada Gold & Casinos has participated in 16 or 17 debt financings, four of which have been in the $200 million and up range.  Nevada Gold & Casinos used CIBC as the investment banker on all of the four.  *See* Transcript of December 28, 2005 hearing ("Tr2.") at 104.  According to Winn, Nevada Gold & Casinos has never been unsuccessful in obtaining capital financing.  He testified further that Nevada Gold has never walked away from a project, and Winn expressed a willingness and ability to obtain additional funds pursuant to a "capital call" if necessary.  He also pointed out that Nevada Gold has a $15 million line of credit and has guaranteed 50% of the payments to Vestin and Scott, as well as to

---

[14]  According to Winn, Nevada Gold & Casinos is a publicly traded company that has been in the gaming business for twelve years.  Winn also serves as President of Nevada Gold NY, Inc.

the Mercer entities, which are all due within the first year after the Effective Date. *Id.* at 117-118.

According to Winn, CIBC is a leading investment banking firm in the gaming industry. He testified that unlike other investment banking firms, CIBC was willing to get involved with sub-$100 million financings. Tr2. at 128. Although Winn acknowledged on cross-examination that there is presently no written commitment of monies with respect to financing the Debtors' reorganization, according to Winn, "our best efforts have always been that we get it done. But you're right, no legal commitment." Tr2. at 132.

The testimony of James Wise ("Wise"), Treasurer and Chief Financial Officer of the Debtors since October 1997, was also presented on behalf of the Debtors concerning projections as to what may or may not happen in the future based on past performance. *See* Debtors' Exhibits 1, 2 and 3. Wise identified Debtors' Exhibit 2 as the projections for the period of June 1, 2005 - December 31, 2005. The first two pages were those attached to the disclosure statement, prepared the end of March 2005 with the assumption of confirmation in August 2005 and 96 days of racing. Also included were projected pre-opening costs for the VLTs that the Debtors had anticipated would be operational in January 2006. Wise testified that the first two pages of Debtors' Exhibit 2 included hotel operations, as well as food and beverage operation for the hotel and the racetrack. There were also special event costs.

Wise identified pages 3-4 of Debtors' Exhibit 2 as the actual numbers for June 1, 2005- November 30, 2005 and an estimate for December 2005. Pages 5-6 of Debtors' Exhibit 2 detail the difference between original projections of March 2005 and the actual numbers for June 2005- December 2005.

Wise identified Debtors' Exhibit 1 as a summary of the major assumptions that were used

in the projections for the revised final budget for 2005, including the assumption that confirmation would have occurred in December 2005.  The changes between the original projections of March 2005 and the actual numbers for June 2005-December 2005 were based on the fact that there was no racing in 2005 and VLT operations were not expected to commence in January 2006.  Wise testified that Debtors' Exhibit 3 contained 2006 projections.  Pages 2-3 of Exhibit 3 were those initial projections made in March 2005 and attached to the VDA/Debtors' Plan.  The final budget for 2006 was based on certain assumptions, including 92 live racing days for April-November 11, 2006 and estimated purses based on a formula; simulcasting to commence March 1, 2006; food and beverage estimates based on discussions with Nevada Gold that they would be provided in-house; VLT operations commencing July 1, 2006.  He testified that his income estimates for each machine per day were based on discussions with representatives from other race tracks that had VLTs in place, as well as with a representative of the New York Racing and Wagering Board.  He estimated a 60% occupancy rate at the hotel based on historical data and also took into account the VLT "split,"  taking into consideration state mandates - 60% to education, 8% to marketing; 8% to the Horsemen; 1.25% to the breeders' fund, leaving 22.75% "profit" from which expenses are to be taken.  Ultimately, Wise projected a loss at the end of 2006 of approximately $2 million. Tr2. at 68, Lines 19-24.  However, according to Winn, he believed that the projections presented by Wise are conservative and that management of both tracks should result in certain economies.  *See* Tr2. at 115-116.

On cross-examination, Wise was asked to compare Debtors' Exhibit 1 and Oneida Exhibit 2.  Wise acknowledged that there is no calculation for the debt service involving either the bridge loan or the $70 million facility that Gural testified to in the figures in Debtors' Exhibit 1.  Tr2.

at 81. He also acknowledged that no consideration was given to the management fee of Nevada Gold or the payment to Scott based on VLT revenues or enhanced payment to the Cherry/Goldfarb Plaintiffs or to the Mercer claimants under the terms of the various settlements (described below). *Id.* at 81-82. By way of explanation, Wise pointed out that the bridge loan was not being made to the Debtors, but to VDA. *Id.* at 15-17. In addition, it is VDA that is obligated under the various settlements. *Id.* at 10-12. Wise also acknowledged that his assumptions were based on the Debtors' obtaining a license for racing, a license for simulcasting and a license for the VLTs.

Settlements:

*Cherry/Goldfarb Settlement (Exhibit "A" of the VDA/Debtors' Plan)*

Golden Cherry Racing Group et al. ("Cherry/Goldfarb Plaintiffs") filed a proof of claim for $30 million based on a breach of contract action in state court seeking to recover compensatory and punitive damages, which was commenced prepetition on July 13, 2003, against Raceway and others. The Cherry/Goldfarb Plaintiffs alleged fraud and tortious interference by certain of Raceway's directors. Raceway at one point in these proceedings objected to the claim, requesting its disallowance or an order limiting the claim to $130,000 on the basis that certain conditions precedent had never been satisfied and no rights had ever vested in the Cherry/Goldfarb Plaintiffs.

On or about September 8, 2005, VDA entered into a settlement with the Cherry/Goldfarb Plaintiffs, which is contingent on confirmation of the VDA/Debtors' Plan. In exchange for assigning the claim to VDA, the Cherry/Goldfarb Plaintiffs are to receive (i) an amount equal to

and paid when the distribution made on a general unsecured claim of $130,000 in the Raceway

bankruptcy case occurs, and (ii) $170,000 plus an amount equal to the difference between

$130,000 and the actual distribution on a $130,000 general unsecured claim if the Plan becomes

effective and VLTs at Vernon Downs race track are licensed, installed, operational and open to

the public for 180 days.


*Scott Settlement (Exhibit "B" of the VDA/Debtors' Plan)*

On or about September 8, 2005, VDA entered into a settlement agreement with the Scott

entities, including Victoria Scott, whereby they agreed to modify their "Participation Interest"

in Vestin Mortgage, Inc. ("Vestin")'s claims.  In exchange, they are to receive a "Participation

New Note" in the amount of $2.86 million for their secured subrogation claim.  The Participation

New Note is guaranteed 100% by Gural and 50% by Nevada Gold & Casinos, Inc.  In addition,

in consideration for the purchase of Scott's equity interests or rights to purchase equity interests

in the Debtors and for the releases granted in the settlement agreement, VDA agreed to pay AVA

the sum of $500,000 upon execution and delivery of the "Term Sheet."  The stock was to be held

in escrow pending the outcome of the confirmation proceedings and was to be released from

escrow to VDA on the Effective Date of the VDA/Debtors' Plan.  Scott also agreed to provide

VDA with proxies to vote the stock in connection with the balloting process in these cases.

Under the terms of the "Scott Settlement," there is also the possibility for additional monies based

on aggregate revenues generated by the VLTs.  *See* Scott Settlement at ¶ 2.  The settlement

required that the Scott entities support the VDA/Debtors' Plan and withdraw the AVA/Raceway

Ventures plan.  There is also a provision for the dismissal of a lawsuit commenced by AVA

against Tioga Downs and the New York State Lottery Commission.  There are releases as to VDA, Gural, the reorganized debtors, etc.  There is also a limitation placed on legal fees with respect to the subrogation claim.  Scott also agrees to waive an unsecured proof of claim he filed for approximately $500,000.  He is also precluded from participating in the equity buy available to current equity, as is Gural and/or VDA so that there won't be any dilution of the 10% buy in equity.  The settlement agreement expires by its terms as of February 28, 2006, in the event the VDA/Debtors' Plan does not become effective.  *See* Scott Settlement at ¶ 9.

The Debtors emphasize that in considering the Scott Settlement, the Court must view the treatment of Scott's claims and equity interest in the context of a global settlement involving Vestin, as well.  In addition, the Debtors emphasize the fact that the Scott Settlement would also have the effect of eliminating the racing and wagering licensing issue that existed with Scott owning the shares, namely the fact that Raceway was unable to get licensed as long as Scott was the majority owner of the company.  Tr1. at 89, Lines 24-25.

With respect to purchasing Scott's stock, Gural testified that it was his intent to simply "throw the stock away," thereby, doubling the amount of shares held by everyone else, i.e. instead of there being 900,000 shares outstanding, there would only be 450,000.  Tr1. at 89, Lines11-17.

*Vestin Settlement (Exhibit C of the VDA/Debtors' Plan)*

Gural described the Vestin Settlement as a piece of the Scott Settlement in that Scott had required that the Debtors settle with Vestin, as well.  Under the terms of the Vestin Settlement,

executed by VDA and Vestin, Vestin was required to vote in favor of the VDA/Debtors' Plan.[15]

Vestin was to receive a "New Note" in full satisfaction of its claims in the principal amount of

$24.5 million.  Vestin was to receive $500,000 as prepaid interest on the Effective Date of the

VDA/Debtors' Plan.  The New Note is 100% guaranteed by Gural and 50% by Nevada Gold &

Casinos, Inc.  There is also a provision in the Vestin Settlement in which VDA agreed "to treat

the $1.2 million secured subrogation claim asserted by Raceway Ventures, LLC, Steven F.

Cohen, Frank A. Leo, Patrick Danan, Leonard Mercer, and International Housing Development

Group, Corp. ("Mercer entities") in the same manner as the New Note."  *See* Vestin Settlement

at ¶ 15.

*Mercer Settlement (VDA Exhibit 3)*

      The VDA/Debtors' Plan also contemplates a resolution with the "Mercer entities," which

hold a subrogation claim as a result of certain guarantees of the underlying Vestin debt.  On

January 19, 2006, the Court signed an Order approving a settlement between VDA and the

Mercer entities pursuant to Code § 1123 and § 1127.  The Mercer Settlement provides that the

unsecured claim of the Mercer entities in the amount of $1.8 million will be paid a total of

$900,000 in 36 monthly installments, commencing 90 days from the date the VLTs are

operational.  In addition, the Mercer entities are not permitted to participate in the distributions

to Class 5A and Class 5B creditors.  Mercer's secured subrogation claim is limited to $1.2 million

with the possibility of an additional $300,000 in the event that the VLT revenue exceeds $58

---

[15]  Counsel emphasized that there is no provision in the settlements requiring the parties
to reject the Oneida Plan.  There are requirements, however, that the parties vote in favor of the
VDA/Debtors' Plan and to vote a preference in favor of the VDA/Debtors' Plan.  Tr1. at 32,
Lines 8-16.

million over a 12 month aggregate period at any point in time within 24 months following VLT

operations.  Tr1. at 33, Lines 14-22

.

*Settlement with VIP Structures, Inc. (Addendum/Supplement to VDA/Debtors' Plan)*

On September 14, 2005, VDA and VIP Structures, Inc. ("VIP") entered in to an agreement

("VIP Agreement"), for payment of  VIP's claim based on its mechanic's lien.  Under the terms

of the VIP Agreement, VIP agreed to forgo interest of approximately $70,000 and to accept

payment of $850,000 in full satisfaction of its claim.  There is also a provision under which the

"Reorganized Debtors" would execute construction management agreement(s) with VIP, giving

VIP the right of first refusal on all construction projects undertaken at the Vernon Downs

racetrack and/or Hotel having an aggregate cost of $100,000 or more, for which VIP would

receive a five percent management fee.[16]

Releases (Article XI of the VDA/Debtors' Plan)

Article XI of the VDA/Debtors' Plan provides for releases by the Debtors to their officers

and board members, including Tracy, Justice Cheney, Wise, E. Andrew Kiley, James Klein,

Giambona, Paul Noyes, Dennis Dowd and Richard Mandell.  *See* § 11.1 of the VDA/Debtors'

Plan.  In addition, the Debtors, as well as the Committee, agreed to provide a full discharge and

---

[16] The VIP Agreement provided for assignment of the VIP claim either the earlier of 60
days after its execution or the effective date of the VDA/Debtors' Plan.  The Notice of Transfer
of the VIP claim was filed on November 15, 2005 (Docket No. 770).  Thus, VIP was still the
owner of the claim when it cast its ballot accepting the VDA/Debtors' Plan and rejecting the
Oneida Plan.

release to Gural, John Simmons, TrackPower, Inc., VDA, Southern Tier Acquisition and Nevada

Gold & Casinos, Inc.  The settlements discussed previously also include releases by the Debtors

to Vestin, the Scott entities, the Mercer entities and the Cherry/Goldfarb Plaintiffs.  *See*

Summary, pp. 27-28 of VDA/Debtors' Plan.  All such releases exclude "any liability arising from

post-Effective Date conduct by any of the parties subject to release by the Debtors . . . ."  *See,*

*e.g.*, § 11.2 of the VDA/Debtors' Plan. There is also a provision which states that entry of a

confirmation order constitutes approval by the Court pursuant to Rule 9019 of the Federal Rules

of Bankruptcy Procedure of the releases based on a finding that they were "(i) in exchange for

good and valuable consideration and a good faith settlement of all such claims and issues; (ii) in

the best interests of the Debtors and holders of claims and interests; (iii) fair, equitable and

reasonable and (iv) given and made after due notice and opportunity for hearing."  *See id.*

Miscellaneous Provisions

All postpetition loans by Gural, VDA, Southern Tier Acquisition "or any other entities

owned or controlled by Gural" shall be converted to equity interests in Reorganized Raceway on

the Effective Date of the Plan.  *See* § 3.2(d) of the VDA/Debtors' Plan

There is also an equity buy-in provision which relates to the current holders of Raceway

equity.  On the Effective Date, the entire stock in Raceway is to be canceled.  *See* VDA/Debtors'

Plan at § 6.3.  "Old" equity, if "qualified," will be entitled to buy a 10% membership interest in

VDA for a total aggregate price of $5,000 ("MSR Equity Buy-In").  *Id.* at § 11.7.  A prerequisite

to the purchase is that those seeking to participate have to hold a horse racing license. Tr1. at 25,

Lines 22-25. Gural, TrackPower, Inc. and Scott are expressly precluded from participating in the

"MSR Equity Buy-In." *Id.* at § 11.7.

According to VDA's counsel, "[t]here are no conditions to confirmation of the VDA plan other than the fact that this Court enters a final order confirming the VDA plan, that there are any number of conditions precedent to the effectiveness date at § 10.2 of the VDA plan which I believe appropriate to address to the Court." Tr1. at 27, Lines 13-18. They were identified as

1.      Classes 1 through 4, as well as administrative creditors other than professional fees and the Gural DIPS, do not exceed $32.5 million.

2.      Confirmation Order satisfactory to the Co-Proponents, and that all documents required to be executed under the terms of the VDA/Debtors' Plan are executed, including the documents relating to the restructured loans of Vestin and the related parties.

3.      Appointment of a new Board of Directors

4.      Approval by the Court of the settlements incorporated by reference in the Plan.

5.      Issuance of a Final Order that is not appealed.

6.      No material adverse effects, as defined in the VDA/Debtors' Plan with respect to the Debtors.

*See* Tr1. at 27-29 and § 10.2 of VDA/Debtors Plan.


## ARGUMENTS


In view of Oneida's withdrawal of its objections to the VDA/Debtors' Plan, the only objections that are presently at issue are those raised by the Association and Bennett. Specifically, the Association asserts that:

1.      The Plan does not provide for any payments whatsoever to the Horsemen. In particular, it does not provide for payment of administrative expenses requested by the Association.

2.      The Plan is based upon Gural's unsubstantiated belief that if he or his entities obtain a license for Tioga Park Racetrack ("Tioga") that the Tioga license could be utilized with respect to Vernon Downs Raceway without the participation of the Horsemen.  He has provided no authority or other legal foundation to substantiate this assertion and it is contrary to statute. New York Racing, Pari-Mutuel Wagering & Breeding Law § 307(1).

3.      There is no firm assurance that exit financing is available or will close or that the contingencies to exit financing will be satisfied.

4.      The Plan is illusory because the releases effectively release the parties from obligations created under the [VDA/Debtors'] Plan itself and related documents that actually arise as of the Effective Date of the Plan.

5.      The Plan fails to provide for reservation of funds to protect either allowed or disputed claims in the event of a dispute and violates Code § 1123 and §§ 1129(a)(1), (2) and (3) as it unfairly discriminates against claims which are subject to dispute and ultimately are allowed.  Specifically, the Association was concerned with the administrative claim it had asserted in excess of $9 million, which was the subject of dispute by the Debtors.

*See* Association's Memorandum of Law, filed January 13, 2006, at 2-3.

While the Court previously ruled that Bennett had no standing to object to confirmation of the VDA/Debtors' Plan based on his claim for the cost of the equipment and furnishings located at the hotel managed by Mid-State Development, the Court finds that the issue of standing based on his asserted indemnification claim, which arose postpetition in his chapter 7 case, against the Debtors in the action pending in the U.S. District Court of Maryland, which is currently stayed pursuant to Code § 362(a), remains unanswered.  Based on the arguments of both parties, it appears that a dispute also exists concerning whether Bennett was prevented from filing a proof of claim in the Debtors' cases.  He has argued that he requested the Debtors provide him with the necessary forms to file a proof of claim and received no response.  The bar date for filing proofs of claim was fixed by the Court as June 15, 2005.  Presently, the Court knows of no

26

pending motion by Bennett seeking permission to file a late proof of claim. Thus, that issue is not presently before the Court.

The Court is cognizant of the fact that Bennett is currently incarcerated, making it difficult to assert his rights. The Court is concerned that those rights not be impinged upon and, accordingly, will consider his objections to the extent that they are based on a contingent claim he might have against the Debtors based on his third party action pending against the Debtors in the Maryland District Court, which is presently stayed. Bennett asserts that he has an indemnification claim in the amount of $635,112.21, which if valid, would be an unsecured claim. In this regard, Bennett contends that the Debtors have failed to make any provision in the VDA/Debtors' Plan to address what at this stage in the proceedings must be considered a disputed contingent claim. The Court must disagree with Bennett's position in this regard. Article IX of the VDA/Debtors' Plan contains "procedures for resolution of disputed, contingent and unliquidated claims or equity interests." In § 9.1(a) the Debtors have the exclusive authority on or before the "Claims Objection Bar Date (180 days after the Confirmation Date)" to file objections to any claims. The Debtors are also given the right to request that the Court estimate any contingent or unliquidated claim. *See* § 9.1(b). Under the terms of the VDA/Debtors' Plan, creditors with allowed unsecured claims are guaranteed a return of 90%. Thus, the Court concludes that the VDA/Debtors' Plan does make provision for disputed, contingent and unliquidated claims such as Bennett alleges he has.

**DISCUSSION**

> The primary responsibility of the bankruptcy court in a Chapter 11 proceeding is to ensure the confirmation of a reorganization plan which rehabilitates the debtor, while providing creditors the maximum return on their claims against the debtor's estate. *Kaiser Aerospace and Electronics Corp. v. Teledyne Indus., Inc.*, 229 B.R. 860, 868-69 (S.D. Fla. 1999). The Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. *National Labor Relations Bd. v. Bildisco & Bildisco*, 465 U.S. 513, 527 1984). The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. *Id.* The Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to this issue.

*In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 496 (Bankr. M.D. Fla. 1999).

Proponents of a plan submitted pursuant to chapter 11 of the Code must establish their compliance with the thirteen elements of Code § 1129 by a preponderance of the evidence.[17] *See In re Bush Indus., Inc.*, 315 B.R. 292, 297 (Bankr. W.D.N.Y. 2004) (citations omitted). The Code imposes an independent duty on the Court to determine whether a given plan satisfies those thirteen elements, regardless of the absence of objections to confirmation. *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003), *aff'd,* 308 B.R. 672 (D. Del. 2004); *In re Valley Park Group, Inc.*, 96 B.R. 16, 21-22 (Bankr. N.D.N.Y. 1989).

1.    Section 1129(a)(1)

Code § 1129(a)(1) requires that "[t]he plan complies with the applicable provisions of this title," including Code § 1122 and § 1123, which govern classification and contents of a plan. *See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988). In this case, the Court finds that the classification requirements set forth in Code § 1122(a) and

---

[17]    The Court's consideration of Code § 1129(a) is under the U.S. Bankruptcy Code as it existed prior to October 17, 2005, the date on which the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 took effect, amending the prior law as it existed on the date the Debtors filed their petitions, to wit: August 11, 2004.

§ 1123(a) have been satisfied.

With respect to Code § 1123(b)(2), Article VII of the VDA/Debtors' Plan addresses the treatment of executory contracts and unexpired leases.  No party in interest has suggested that the provisions therein are in any way objectionable, and the Court concludes that they are appropriate, including the provision that any claims arising from the rejection of an executory contract and/or unexpired lease be filed within thirty days following entry of the Confirmation Order.

Code § 1123(b)(3)(A) provides that a plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate . . . ."  In considering whether to approve a settlement, the Court must determine that it is fair, equitable and in the best interest of the estate and creditors.  *See In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 751 (Bankr. M.D. La. 1999); *In re Best Products Co., Inc.*, 177 B.R. 791, 794 (S.D.N.Y. 1995), *aff'd* 68F.3d 26 (2d Cir. 1995).  To this end, the courts have examined a variety of factors, including whether the settlement has the support of the debtor's creditors and whether it was the product of arms-length bargaining and not the result of fraud or collusion.  *See id.*; *Cajun Elec.*, 177 B.R. at 751.

In this case, Gural testified that early on in his involvement with the Debtors, he recognized the need to have a consensual restructuring.  He reached the conclusion that "the best thing to do was to make deals with every single combatant in this case . . . ."  Tr1. at 87, Lines 18-20.  Accordingly, he began negotiating in earnest with various parties, which ultimately culminated in the Third Modified Amended Plan of Reorganization, filed on September 13, 2005.  The VDA/Debtors' Plan incorporates the agreement with the Scott entities, which Gural believed to be the "linchpin" of the restructuring of the Debtors.  It also incorporates the settlement of the

Vestin claim, described as the "10,000 pound gorilla by way of dollar amount." Tr1. at 17, Line

22-24.  Gural further explained that in negotiating the settlements, it was intended that there be

mutual releases for everyone and an end to litigation.  Tr1. at 88, Lines 20-25.  The

VDA/Debtors' Plan also includes a settlement with the Cherry/Goldfarb Plaintiffs, who had

asserted a claim of $30 million in their lawsuit against Raceway, as well as a settlement with VIP.

The Court finds that the settlements were reached as a result of arms-length negotiations

among the parties.  Indeed, the Court commented earlier in these cases that "[t]he efforts by Gural

and the Debtors in negotiating settlements appears to have been solely directed at reaching

resolutions of matters that might interfere with the ultimate confirmation process."  *In re Mid-

State Raceway, Inc.*, Case Nos. 04-65745-46, slip op. at 14 (Bankr. N.D.N.Y. Dec. 22, 2005).

The settlement with the Cherry/Goldfarb Plaintiffs will save the Debtors substantial costs

and expenses associated with the defense of such an action, which would, in all likelihood, have

required substantial time to adjudicate, time the Debtors can ill afford given the nature of their

business and the need to recommence operations at the race track in 2006.  In addition, no one

disputes that the Vestin and Scott settlements are vital to the VDA/Debtors' Plan.  Vestin's claim

in excess of $20 million could well have crippled any efforts at reorganization.  In addition, the

settlement involving the Scott entities resulted in the withdrawal of a competing plan and settled

a variety of claims held by Scott, some of which were the subject of pending litigation.  The

settlement with Scott also assuages some of the concerns of the New York Racing & Wagering

Board, which expressed reluctance to approve licensure while Scott/Victoria Scott remained a

major shareholder of Raceway.  In the view of the Court, the settlements have eliminated a

number of roadblocks for the Debtors and have facilitated the creation and implementation of the

VDA/Debtors' Plan, thereby providing benefit to the Debtors' estates and creditors.  It is also clear that the settlements have the affirmative support of the creditors as evidenced by the overwhelming acceptance of the creditors of the VDA/Debtors' Plan and their expressed preference for its confirmation.

With respect to the settlements, as well as the VDA/Debtors' Plan, it is also appropriate to comment on the releases provided therein to third parties.  Admittedly, the Code does not explicitly authorize the release of claims against non-debtors.  *In re Continental Airlines,* 203 F.3d 203, 211 (3d Cir. 2000).  As the courts have acknowledged, releases to non-debtors are appropriate features of a chapter 11 plan in some circumstances.  *See SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2d Cir. 1992).  As the Court of Appeals for the Second Circuit recently indicated, nondebtor releases are proper only in rare cases and have generally been approved only where the estate received substantial consideration.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-42 (2d Cir. 2005).  Specifically, the Second Circuit  found that  "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan . . . ."  *Id.* at143.

In connection with the settlements themselves, which contain the releases incorporated in the VDA/Debtors' Plan, the Court has made its finding that the settlements are fair, equitable, reasonable, in good faith and in the best interests of the Debtors and the creditors.  Through the extensive negotiations and ultimate settlements, a single plan has evolved which has the support of the creditors.  An examination of the various settlements gives evidence to the extent of the disputes underlying those negotiations and the resultant compromises.  The Court concludes that

the releases found both in the VDA/Debtors' Plan and the various settlements, incorporated therein, were both necessary to the reorganization and warranted under the circumstances.[18]

2.      Section 1129(a)(2)

Code § 1129(a)(2) requires that the plan proponents comply with Title 11, including Code § 1125, which applies to the solicitation and acceptance of the plan.  The VDA/Debtors' Disclosure Statement was previously approved by this Court as providing adequate information on which the creditors could make an informed decision.  The Court finds that the plan proponents have properly solicited acceptances to the VDA/Debtors' Plan.

3.      Section 1129(a)(3)

Code § 1129(a)(3) requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law.  The inquiry must focus on the plan itself and whether it will "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *In re Global Water Technologies, Inc.*, 311 B.R. 896, 902 (Bankr. D.Colo. 2004) (citations omitted); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 238 (Bankr. D.N.J. 2000).

> The "good faith test" requires that the proposed plan "bear some relationship to the statutory objective of resuscitating a financially-troubled corporation." *Johns-Manville Corp.*, 843 F.2d at 649.  In this context, the good faith test means that the plan was proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.

---

[18] The Association expressed concerns that some of the releases provided by the VDA/Debtors' Plan could be interpreted to relieve the parties of obligations that were created by the VDA/Debtors' Plan and which arise as of the Effective Date.  The Court does not believe that to be the intent.  Indeed, the VDA/Debtors' Plan specifically provides that any such releases exclude "any liability arising from post-Effective Date conduct by any of the parties subject to release by the Debtors . . . ."  *See, e.g.*, § 11.2 of the VDA/Debtors' Plan.

*In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990). *See also In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (indicating that "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied").

In this case, VDA/Debtors have demonstrated a determination to reorganize through what has been a very lengthy and arduous process involving competing plans. The plan now under consideration by this Court is the culmination of those efforts. Under the terms of the VDA/Debtors' Plan, which has the support of the Committee, it is estimated that unsecured creditors will be paid between 90-100% on their claims. The VDA/Debtors' Plan envisions substantial capital expenditures to renovate the harness track and complete the construction of the VLT facility. The proponents envision the resumption of racing at Vernon Downs in 2006, a result which not only benefits the creditors but also the local economy of the region. Based on the totality of circumstances, the Court must conclude that the VDA/Debtors' Plan was filed in good faith pursuant to Code § 1129(a)(3).

4.      Section 1129(a)(4)

Code § 1129(a)(4) requires that any payments made or to be made by the plan proponents or by the debtors under the plan of reorganization be approved by the Court.

5.      Section 1129(a)(5)

Code § 1129(a)(5) requires that the plan proponents disclose the identity and affiliation of individuals proposed to serve after confirmation as officers and directors of the debtors/reorganized debtors. The VDA/Debtors' Plan complies with this section as set forth in

the Plan Supplement, dated November 23, 2005, identified as "Plan Section 6.5(c) Disclosures"

(Docket No. 829). The initial directors of the Reorganized Debtors are to be Winn, Jonathan A.

Arensen, Donald A. Brennan, Gural and Tracy, all with credentials indicating substantial business

experience. The initial officers are identified as Gural, who is to serve as CEO and Arensen, who

is to serve as Secretary, of both Reorganized Debtors.

6.    Section 1129(a)(6)

     Code § 1129(a)(6), which requires that a governmental regulatory commission approve

any rate changes provided in the plan, is inapplicable to the instant case.

7.    Section 1129(a)(7)

     Code § 1129(a)(7) requires that the claimants in each impaired class either accept the plan

or receive or retain property of a value that is not less than what they would receive or retain in

a chapter 7 liquidation proceeding. This requirement is commonly known as the "best interests

of creditors test." *Johns-Manville Corp.*, 843 F.2d at 649. At the hearing on confirmation

conducted on December 28, 2005, a stipulation between VDA/Debtors and Oneida was placed

on the record that the VDA/Debtors Plan, as well as that of Oneida, met the liquidation analysis

and were in the best interest of creditors. *See* Tr2. at 44, Lines 6-16. In addition, no other parties

have raised any objections under Code § 1129(a)(7).

     In this case, Classes 3, 4, 5A and 5B are impaired and have voted to accept the

VDA/Debtors' Plan. Class 6, members of which hold equity interests in Raceway, will receive

no distribution under the VDA/Debtors Plan and, accordingly, were deemed to have rejected it.

Pursuant to the liquidation analysis performed by VDA/Debtors, as set forth in the Disclosure

Statement at 63-64, neither unsecured creditors nor equity interests in Raceway would receive

34

any recovery because the claims of Vestin are undersecured. Thus, equity interest holders in

Class 6 would receive no more property under a chapter 7 liquidation than under the

VDA/Debtors' Plan. Therefore, upon review of the Debtors/VDA Plan, the Court finds that the

requirements of Code § 1129(a)(7) have been satisfied.

8.    Section 1129(a)(8)

Code § 1129(a)(8) requires that each class of <u>claims</u> has either accepted the plan or is

unimpaired under the plan. Classes 1 and 2 are unimpaired. Classes 3, 4, 5A and 5B are

impaired and all four classes voted to accept the VDA/Debtors' Plan by the required majorities

set forth at Code § 1126(c), namely more than one-half in number and two-thirds in amount. At

the hearing on December 16, 2005, the Court made a preliminary finding that the VDA/Debtors'

Plan had been accepted by the requisite number and amount of claimants entitled to vote. *See*

Tr1. at 12-13.

The VDA/Debtors' Plan provides that "all Class 6 Equity Interests shall be cancelled and

shall be of no further force and effect, whether surrendered for cancellation or otherwise. Class

6 Equity Interests [ of Mid-State Raceway, Inc.] shall not receive a distribution under the Plan."

*See* VDA/Debtors' Plan at § 4.6(b). Thus, Class 6 is impaired and is deemed to have rejected the

Plan pursuant to Code § 1126(g). Accordingly, confirmation requires that Class 6 be "crammed

down" pursuant to Code § 1129(b) provided that the VDA/Debtors' Plan does not discriminate

unfairly and is fair and equitable with respect to Class 6. *See Bush Indus.*, 315 B.R. at 297.

As noted previously, on December 2, 2005, the Debtors filed their application seeking

pursuant to Code § 1129(b)(2) to cram down Class 6, which was deemed to have rejected the

VDA/Debtors' Plan. The Debtors' motion was unopposed.

Implicit in Code § 1129(b)(2) is that "stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent." *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984). There has been no proof or suggestion that Raceway is solvent. In addition, there is no class junior to the Raceway equity interest, thereby meeting the standards for being fair and equitable. As this Court indicated at the confirmation hearing, "[t]he cramdown motion, vis a vis Class 6, the equity in the Raceway case is presumably being granted since there is no opposition to that motion." Tr2. at 143, lines 14-16.

9.    Section 1129(a)(9)

Code § 1129(a)(9) requires that certain administrative claims be paid in full on the Effective Date of the plan. The VDA/Debtors' Plan provides for payment of the applicable administrative claims in accordance with Code § 1129(a)(9). *See* § 3.2(a) of the VDA/Debtors' Plan.

At the time that the Association filed its objection, it had requested that the Court grant it an administrative expense claim in excess of $9 million. The Association asserted that the VDA/Debtors' Plan does not take into account that possible claim, as acknowledged by Gural at the evidentiary confirmation hearing (*see* Tr1. at 149-150), and, therefore, would not comply with Code § 1129(a)(9) in the event that the Court granted its request. On January 30, 2006, the Court issued its Memorandum-Decision, Findings of Fact, Conclusions of Law and Order, denying the Association's request for an administrative expense claim in that amount, thereby rendering this portion of the Association's objection moot.

10.    Section 1129(a)(10)

Code § 1129(a)(10) requires as a condition to confirmation that if there are any classes

of claims that are impaired under the plan, that at least one class of impaired claims has accepted the plan, exclusive of the acceptance of the plan by any insider.  As noted previously, Classes 3, 4, 5A and 5B are impaired.  All of those classes have voted to accept the VDA/Debtors' Plan. Therefore, the Court finds that this requirement has been satisfied.

11.    Section 1129(a)(11)

Code § 1129(a)(11) requires a finding by the Court that confirmation is not likely to be followed by liquidation or further financial reorganization, generally referred to as "feasibility." The Court has an affirmative obligation to scrutinize a reorganization plan to determine whether it is feasible, regardless of whether there is any objection raised by a party in interest.  In this regard, the Court need not require a guarantee of success; rather, it must find a "reasonable assurance of success." *Johns-Manville Corp.*, 843 F.2d at 649.  At the same time, the Court must "prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985), citing COLLIER ON BANKRUPTCY, ¶ 2239[11] at 1129-34 (15th ed. 1984). *See also Sound Radio, Inc.*, 93 B.R. at 855 (noting that "'sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises.'" (citation omitted)).

The Association takes issue with Gural's assertion that Raceway will be able to utilize the license granted to Tioga Downs, if necessary.  The Association contends that without an agreement with a recognized horsemen's association, Raceway will be unable to obtain its own licenses.  The Association also points out that the bridge loan from RCG required that the "Borrower" provide evidence that all licenses necessary for operation of the race track be issued.

*See* VDA's Exhibit 7 at Exhibit A - General Conditions at ¶ 3(c).  The Court would note, however, that the agreement with RCG for bridge financing apparently terminated on January 31, 2005.  *See* VDA's Exhibit 7 at ¶ 12.

Whether or not Raceway will be allowed to operate under the license issued to Tioga Downs and whether there is a 2006 racing season at Vernon Downs is somewhat of an ancillary issue for the Court since its main focus is on the "exit financing" that is to be available for payment to the creditors on or about the Effective Date of the VDA/Debtors' Plan.  As noted above, the bridge loan for $15 million apparently terminated on January 31, 2005.  Gural provided the Court with what VDA/Debtors contend were "reasonable assurances" that the necessary funding would be available on the Effective Date to make the distributions to creditors in Classes 1, 2, 3, 5A and 5B, as well as to the entities in Class 4 pursuant to the terms of the applicable settlements.  According to VDA/Debtors, the funding will consist of (a) the conversion of in excess of $2.5 million representing the Gural DIP financing to emergence equity in Raceway; (b) an equity cash infusion of approximately $11.3 million by VDA and its business partners; and (c) an Emergence Loan by VDA of $3.0 million.  *See* Joint Post-Trial Memorandum of VDA/Debtors in Support of Confirmation at 3.  As noted previously, Gural testified under oath that while he had no written commitment for financing, he personally could write a check for four or five million dollars and members of Southern Tier Acquisitions had sufficient financial resources to come up with $50 million if necessary.  Given Gural's history in these cases and his ability to provide DIP financing while this process has been ongoing, the Court believes that the assurances by Gural are at least "reasonable."  The Court also has no reason to question the financial wherewithal of the other individuals who are members of TrackPower, Inc. and

Southern Tier Acquisitions.

The Court recognizes the case law requiring that the proponent of a plan has the burden to demonstrate that it has a firm financing commitment to consummate the plan. *See, e.g., In re Repurchase Corp.*, 332 B.R. 336 (Bankr. N.D. Ill. 2005); *In re Made in Detroit*, 299 B.R. 170 (Bankr. E.D. Mich. 2003); *In re Ralph C. Tyler*, 156 B.R. 995 (Bankr. N.D. Ohio 1993) (all cases cited by the Association). In *Ralph C. Tyler*, the debtor's plan provided for funding from preference actions, which the court found "untenable" in view of the fact that the debtor's analysis determined that no preferences existed. *Id.* at 997. The plan also provided for financing from outside sources without presenting any evidence of any "firm financing in place." *Id.* The debtor's plan indicated a distribution date of "any date, subsequent to the effective date." *Id.* The court expressed concerns regarding those distributions that must be made on the effective date pursuant to Code § 1129(a)(9) and Code § 1124(3). *Id.*

In *Made in Detroit*, the debtor's plan provided for provided for a $9 million loan from Kennedy Funding, Inc. *Made in Detroit*, 299 B.R. at 172. From the $9 million loan, the debtor's plan provided for payment to the secured creditors and administrative claimants and an initial distribution to unsecured creditors of $750,000, with the balance to be paid from the proceeds of the sale of lots. *Id.* at 174. The funding was contingent on debtor's payment of a $270,000 commitment fee and a $15 million valuation of the debtor's real property. *Id.* at 172. The debtor intended to obtain loans or capital contributions from shareholders and others to pay the commitment fee. *Id.* at 173. The court concluded that the plan was not "sufficiently concrete" given that there was no assurance that the loan would ever close or the value of the real property would be appraised at $15 million. *Id.* at 177. In reaching this conclusion, the court relied on

three decisions involving plans which provided for payment to creditors from the speculative sale

of real property. *Id.* at 176-177, citing *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985),

*In re Walker*, 165 B.R. 994 (E.D. Va. 1994), and *In re Thurmon*, 87 B.R. 190 (Bankr. M.D. Fla.

1988).

      The decision in *Repurchase* was written in the context of a motion pursuant to Rule 59(e)

of the Federal Rules of Civil Procedure by the debtor, seeking to amend an order denying

confirmation of its plan and to vacate a dismissal order of the bankruptcy court. The debtor in

*Repurchase Corp.* had been in the business of acquiring and selling investment securities.

*Repurchase Corp.*, 332 BR. at 338. Its last acquisition had been in 2001, three years prior to its

filing its chapter 11 petition. *Id.* The corporation was owned by Leon Greenblatt and his wife.

*Id.* According to the debtor's amended disclosure statement, the debtor's only asset consisted of

net operating loss carryovers. The plan provided that Greenblatt would contribute $100,000, and

at the confirmation hearing, he testified that actually it was his wife that would be providing the

$100,000. *Id.* at 339. No proof of the money being available was provided to the court. *Id.* In

addition, Greenblatt acknowledged that since the debtor's filing it had been unable to attract new

investors to invest in the debtor so as to be able to purchase new investments postpetition. *Id.*

The court found that Greenblatt's testimony concerning his "hopes for funding was neither

corroborated nor credible." *Id.* at 344. The court also denied the debtor's request that it be

allowed to reopen the record to provide evidence of a financing agreement to fund the plan. *Id.*

at 344. All of the debtor's requests were denied.

      The Court is of the opinion that where a chapter 11 plan of reorganization proposes to

make payments to creditors over a period of months or years, the standard for determining

feasibility is, to a certain extent, somewhat less stringent because of the many contingencies that come with the passage of time.  In the matter under consideration, however, the VDA/Debtors' Plan proposes that the payments of most claims, other than those in Class 4, are to be made on or about the Effective Date.  VDA/Debtors are not relying on the speculative sale of real property at some date in the future in order to fund the plan, as was the case in *Made in Detroit.*  Nor are VDA/Debtors proposing to pay the unsecured creditors at some undetermined date in the future, as was the case in *Ralph C. Tyler.*  In the situation where the payments are, for the most part, to be made on the effective date of the plan, as proposed by VDA/Debtors, the Court is of the opinion that closer scrutiny of feasibility is required.

In this case, while VDA/Debtors have failed to provide, by a preponderance of the evidence, proof of a firm commitment for the exit financing required in order to make the necessary payments on the Effective Date, the Court has the testimony of Winn concerning the past record of Nevada Gold & Casinos, Inc. in providing financing.  The Court also cannot ignore the investment that Gural has made in this case over the past several months, either directly or indirectly, which has allowed the Debtors to continue their operations while a consensual plan was being negotiated.  Gural also has demonstrated a certain financial wherewithal and commitment to harness racing in New York in the chapter 11 case of Tioga Park, LLC, Case No. 03-60078, previously pending before this Court.  In addition, unlike in the case of *Repurchase Corp.*, there has been overwhelming evidence that investors are interested in funding the Debtors' reorganization, as evidenced by the competing plan previously submitted by Oneida and its subsequent commitment to provide the Reorganized Debtors and Tioga Downs with $20 million post-confirmation.  Most importantly, the Court cannot ignore the overwhelming support of those

who have an economic stake in the success of the VDA/Debtors' Plan and have voted in favor

of its confirmation.

While the VDA/Debtors' plan can hardly be construed as a "visionary scheme" of what

they can accomplish in the months following confirmation, the Court does believe it appropriate

to require more than reasonable assurances concerning the financing which is to be available on

the Effective Date if it is to enter an Order ultimately confirming the VDA/Debtors' Plan.

Accordingly, the Court will require VDA/Debtors to provide written proof satisfactory to this

Court that sufficient monies required to be paid to creditors on or about the Effective Date, as set

forth in the VDA/Debtors' Plan, are on deposit in the Debtors/VDA account before it will sign

an Order confirming the VDA/Debtors' Plan .

12.    <u>Section 1129(a)(12)</u>

Code § 1129(a)(12) mandates the payment of fees required pursuant to 28 U.S.C. § 1930,

including filing fees and United States Trustee quarterly fees.  VDA/Debtors have represented

that all such fees will be paid when due, or as soon thereafter as is practicable, and the Court is

not aware of any objection by the United States Trustee.  *See* § 3.2(b) and § 13.3 of the

VDA/Debtors' Plan.

13.    <u>Section 1129(a)(13)</u>

Code § 1129(a)(13) requires that the plan provide for the continuation after its effective

date of payment of all retiree benefits.  Pursuant to § 7.3 of the VDA/Debtors' Plan, "all

employment and severance practices and policies, and all compensation and benefit plans,

policies and programs of the Debtors, including without limitation , all savings plans, retirement

plans, health plans . . . shall be deemed assumed on the Effective Date by operation of the Plan

. . . unless a motion to reject such unexpired contact [sic] is pending before the Bankruptcy Court on the Confirmation Date . . . ."  The Court finds that Code § 1129(a)(13) has been satisfied.

Upon proof of compliance with the conditions hereinafter imposed, the Court concludes that VDA/Debtors will have satisfied of the requirements for confirmation mandated under Code § 1129(a) and are entitled to submit a proposed order confirming the VDA/Debtors' Plan of Reorganization.

Based on the foregoing, it is hereby

ORDERED that the Debtors' motion pursuant to Code § 1129(b)(1) seeking to cram down Class 6 is granted; it is further

ORDERED that within fifteen (15) days of the date of this Order, or such later time as may be requested after notice and hearing, VDA/Debtors shall provide written proof to the Court that they have sufficient monies on deposit to fund all payments due to creditors who are to be paid on the Effective Date, as set forth in the VDA/Debtors' Plan; and it is further

ORDERED that along with said proof, VDA/Debtors shall submit a proposed order of confirmation in accordance with the terms of the decision herein.

Dated at Utica, New York

this 10th day of February 2006

 /s/ Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge